[This decision has been published in *Ohio Official Reports* at 95 Ohio St.3d 181.]

THE STATE OF OHIO, APPELLEE, *v.* LAMAR, APPELLANT.

[Cite as *State v. LaMar,* 2002-Ohio-2128.]

*Criminal law—Aggravated murder of five prison inmates during prison riot— Death penalty upheld, when.*

(No. 1998-1983—Submitted November 14, 2001—Decided May 15, 2002.)

APPEAL from the Court of Appeals for Lawrence County, No. 95CA31.

———————————

COOK, J.

{¶1} The appellant, Keith LaMar, was convicted of murdering five prison inmates during the infamous April 1993 riot at the Southern Ohio Correctional Facility ("SOCF") in Lucasville. The trial court sentenced LaMar to death for four of these murders. For the reasons that follow, we affirm.

**I. Factual Background**

{¶2} On the afternoon of April 11, 1993, a group of Muslim inmates seized control of cellblock "L" ("L-Block") at SOCF. The rioting inmates took several guards hostage and locked inmates considered "snitches" into various cells in the L-6 section of L-Block. The Muslim inmates maintained control of unit L-6 while two other dominant groups—the Aryan Brotherhood (a racist group of white inmates) and the Black Gangster Disciples (a prison gang)—controlled other units within L-Block.

{¶3} On the day of the riot, LaMar was an SOCF inmate serving a sentence of eighteen years to life for a 1989 murder conviction. LaMar, who was not a Muslim, did not plan or participate in the prison takeover and was in the prison recreation yard when the riot began. But after the commotion began, LaMar and two other inmates, Louis Jones and Derek Cannon, went back inside L-Block to check the personal belongings in their respective cells. When the three were unable

to get back outside because the Muslims had closed access to and from L-Block, LaMar said to Jones and Cannon, "Ain't no need in us staying in here getting caught up in something we're not a part of. Let's kill all the snitches and get out to the yard."

{¶4} LaMar approached Cecil Allen, a leader of the Muslim group of inmates, and asked, "if we kill the snitches, could we be let out to the yard so we don't be a part of this?" Allen consulted with the Muslim leadership and returned a few minutes later to tell LaMar that the "orders has [sic] been granted to kill the snitches."

{¶5} After Allen granted permission to "kill the snitches," LaMar, Jones, and Cannon walked around the L-Block corridor to enlist other inmates to help them. Eventually, the group recruited Hiawatha Frezzell (a.k.a. "Pittsburgh"), Eric Scales (a.k.a. "Tiger"), Derrick Mathews, Rasheem Matthews, Albert Young (a.k.a. "Da-Da"), and Gregory Curry to join the newly formed death squad. LaMar's group proceeded to unit L-2, where they retrieved bats, shovels, and weight bars to use as weapons. The men also wore masks fashioned from T-shirts, towels, and bandannas.

{¶6} After arming and disguising themselves, LaMar and his group returned to L-6. Inmate Timothy Grinnell was operating the console that controlled the cell doors within L-6. LaMar led his group to the upper tier of the cellblock and instructed Grinnell to open a cell occupied by Andre Stockton. After Grinnell complied with the demand, LaMar and Curry entered the cell and beat Stockton with a shovel and a baseball bat. Other members of the group dragged Stockton from the cell and participated in the beating.

{¶7} After beating Stockton, the group went downstairs to the lower tier of L-6. LaMar yelled at Grinnell to open the cells occupied by inmates Ellis Walker and Darrell Depina. After Walker refused to comply with LaMar's command to come out of the cell, LaMar and Curry dragged him to the main floor of the

cellblock and beat him repeatedly. Other members of the death squad also participated in Walker's beating. LaMar then ordered Depina out of his cell. When Depina refused, LaMar entered the cell and hit him several times before dragging him to the main floor, as he had done with Walker. LaMar continued to beat Depina with a baseball bat, striking him several times. Other members of LaMar's group joined in beating Depina, who died from his injuries.

{¶8} When LaMar finished beating Depina, he ordered Grinnell to open a cell occupied by Bruce Vitale. When Vitale refused to come out of the cell, LaMar hit him on the head with a shovel. LaMar continued beating Vitale on the head and at one point knocked a tooth out of Vitale's mouth. Vitale tried to defend himself by crawling under the bed, but LaMar and Curry dragged him out of the cell and continued the beating, joined by other members of the death squad. At one point, LaMar told Jones, "I didn't bring you all in here to stand around," when he noticed that Jones was not participating in the assault. Vitale was still alive when the group left him but died after Frezzell and another member of LaMar's group stabbed and beat him again.

{¶9} LaMar continued on to a nearby cell occupied by Thomas Taylor, another suspected snitch. Before LaMar could order Taylor's cell opened, a Muslim inmate named Harris intervened and told LaMar that Taylor was under Muslim protection. LaMar angrily pushed Harris out of the way, saying, "If he [Taylor] is in there, he's a snitch. Fuck it. Kill him." After Taylor told LaMar that he was not a snitch, LaMar agreed to spare Taylor's life, but only if Taylor would kill Albert Staiano, who was locked in an adjacent cell. To save his own life, Taylor agreed. LaMar ordered Taylor's and Staiano's cells opened and commanded one of the other inmates to give a baseball bat to Taylor. Staiano tried to run from his cell, but fell to the ground when Frezzell tripped him. Taylor hit Staiano over the head several times with the baseball bat and then, after the bat broke, with a fire extinguisher. Other death-squad members, not including LaMar, joined in the

assault and stabbed Staiano repeatedly. When the beating ended, LaMar ordered Taylor to return to his cell. Taylor eventually pleaded guilty to involuntary manslaughter for his role in Staiano's death.

{¶10} The death squad's next stop was a cell occupied by Michael Trocadero and four to five other inmates. LaMar ordered Grinnell to open the cell, but Grinnell refused, saying that the Muslim leadership did not want those inmates killed. As LaMar and his group began to leave L-6, it passed the cell of William Svette, an elderly inmate who used a walker to move himself around. Svette, who appeared to have been beaten earlier, cursed the death squad with obscenities and racial epithets. On LaMar's order, Grinnell opened Svette's cell, where LaMar and Curry beat Svette over the head with a baseball bat and a shovel. LaMar started to leave the cell but returned to beat Svette again after noticing that Svette's legs were moving.

{¶11} Svette remained alive after the death squad left his cell. A short time later, on Grinnell's instructions to make sure all of the victims in L-6 were dead, inmate Eric Girdy struck Svette across the head twice more with a baseball bat. Svette continued to live after Girdy's beating and was still alive after inmate Robert Bass, on orders from one of the Muslim inmates, dragged Svette's body to a ramp near a prison recreation area. Svette eventually died after yet another inmate, Freddie Frakes, beat him yet again with a baseball bat.

{¶12} After finishing their rampage, LaMar and the others left L-Block and joined the large contingent of inmates gathered in the recreation yard. Many of the participants in the L-6 killings remained together and discussed what had transpired. During this time, LaMar saw inmate Dennis Weaver in the recreation yard and told Curry, "I wish Weaver was in there. I'd have killed him, too."

{¶13} Early the following morning, law enforcement officers surrounded the approximately three hundred inmates gathered in the recreation yard and herded them to a gymnasium on the SOCF grounds, where the inmates were handcuffed

4

and taken to various cells around the prison. LaMar occupied a cell in K-Block with nine other inmates: Scales, Frezzell, Weaver, William "Geno" Washington, Jeffrey Mack, Michael Childers, Ricky Rutheford, William Bowling, and John Malveaux. These ten inmates remained in the cell without incident for the rest of the day.

{¶14} The next day, however, tensions began rising in the cell. LaMar and Scales began harassing Weaver, accusing him of being a snitch and telling him that "all snitches should be killed." Weaver denied being a snitch and urged his fellow cellmates to protest what he perceived as mistreatment of the inmates who were not involved in the riot. LaMar became incensed by Weaver's comments, yelled "shut up, snitch," punched Weaver in the face, and relegated him to a corner of the cell. Scales and Mack also joined in the attack on Weaver. LaMar later ordered that Weaver, Malveaux, Bowling, and Childers be tied up.

{¶15} Later that day, LaMar announced to the cellmates that "I want Mr. Weaver dead. I want that snitch dead right now." LaMar then accused Bowling of being a snitch and threatened to kill Bowling if Bowling did not kill Weaver. LaMar untied Bowling, handed him some string, and watched Bowling choke Weaver. LaMar also threatened Rutheford, who then aided Bowling in the assault by holding Weaver's feet. LaMar became impatient with Bowling's progress and told Childers, "[I]f you want to live, if you ain't no snitch, then you help kill him." LaMar then untied Childers, who complied with LaMar's order by choking Weaver, using the ropes with which LaMar had tied Childers's wrists. When Childers began hitting and kicking Weaver, LaMar told him to "just strangle him" because LaMar wanted "to make it look like he hung hisself." LaMar aided Childers by stuffing toilet paper and pieces of plastic down Weaver's throat in an effort to silence him. Weaver eventually died while Childers was choking him.

{¶16} After Weaver died, LaMar instructed Bowling and Malveaux to move the body to a corner of the cell. He also ordered them to tie a string from a

cell mattress around Weaver's neck "and hook it to the coat hook to make it look like a suicide." And before corrections officers removed Weaver's body, LaMar instructed everyone in the cell to tell them that Weaver had killed himself.

{¶17} The grand jury indicted LaMar on nine counts of aggravated murder for his role in the deaths of Depina, Vitale, Staiano, Svette, and Weaver. Five of the aggravated-murder counts alleged that LaMar killed each of the victims with prior calculation and design. R.C. 2903.01(A). The remaining counts charged LaMar with murdering Depina, Vitale, Staiano, and Svette while committing or attempting to commit kidnapping. R.C. 2903.01(B). In addition, the grand jury charged LaMar with four death-penalty specifications attached to the first eight counts of the indictment: R.C. 2929.04(A)(4) (murder committed in a detention facility); (A)(5) (prior murder conviction); (A)(5) (murdering two or more victims); (A)(7) (murder committed while committing or attempting to commit kidnapping). The ninth count, charging Weaver's murder, alleged only three of these specifications; it did not charge LaMar with the kidnapping specification.[1]

{¶18} At trial, LaMar testified on his own behalf and denied committing any of the five murders. LaMar testified that he was in the recreation yard when the riot began and went back inside L-6 briefly to get his personal belongings. LaMar explained that while inside, he spoke briefly with Allen after Grinnell had accused LaMar of trying to "get guys out the cells." According to LaMar, Allen did not believe Grinnell and allowed LaMar to leave the cellblock. LaMar testified that he returned to the recreation yard and never went back into L-6 that day. He told the jury that he stayed in the recreation yard until the early morning hours of April 12, when corrections officers and state troopers surrounded the yard and ordered the inmates into the gymnasium. LaMar's alibi testimony was corroborated

---

1. The indictment did not include any counts relating to the assaults on Stockton and Walker.

by four inmate witnesses who each testified to having seen and talked to LaMar in the yard during the early stages of the riot.

{¶19} LaMar also testified to the events surrounding Weaver's murder, which took place after officers placed the two men, along with eight others, in a holding cell in K-Block. LaMar stated that he and Scales argued with Bowling about the distribution of food and admitted to punching Bowling in the face. He denied, however, tying up other inmates or assaulting Weaver. According to LaMar, Bowling tied up Childers and started punching Weaver after Weaver came to Childers's defense. LaMar testified that Bowling then grabbed Weaver around the neck in a "half Nelson" until Weaver lost consciousness. Bowling then untied Childers, who also choked Weaver until Weaver died. LaMar admitted lying to investigators about the events leading to Weaver's death, but said that he lied because he didn't "want nothing to do with it."

{¶20} Two defense witnesses corroborated LaMar's account of Weaver's murder. Inmate Cory Perkins, who was in an adjacent cell, testified that he heard Bowling call Weaver a "snitch." Perkins also testified that he heard someone else in the cellblock suggest that Weaver be killed. William Washington, who was in the K-Block cell with LaMar and Weaver, also corroborated LaMar's story by identifying Bowling and Childers as the inmates who killed Weaver. According to Washington, LaMar did not touch Weaver, did not order anyone to hurt Weaver, and did not say anything about Weaver. On cross-examination, however, the prosecution impeached Washington with a prior statement in which he identified LaMar as one of Weaver's assailants.

{¶21} The jury returned guilty verdicts on all the charges and specifications alleged in the indictment. Following the penalty-phase proceedings, the jury recommended the death penalty for the murders of Depina, Vitale, Svette, and Weaver. For Staiano's murder, the jury found that LaMar should be sentenced to life imprisonment with parole eligibility after thirty years. The trial court issued a

sentencing opinion in which it agreed with the jury's recommendation and sentenced LaMar to death for the murders of Depina, Vitale, Svette, and Weaver. LaMar appealed to the Fourth District Court of Appeals, asserting nineteen assignments of error. The court of appeals overruled each of the assignments and affirmed the convictions and death sentence. The cause is now before this court upon an appeal as of right.

## II. Settled Issues

{¶22} LaMar presents twenty propositions of law for our review. Although R.C. 2929.05 grants a capital defendant an appeal of right to this court, we are not required to discuss in opinion form each proposition raised in the appeal. *State v. Davis* (1996), 76 Ohio St.3d 107, 110, 666 N.E.2d 1099. We may therefore summarily overrule those propositions of law that this court has previously resolved and address only those issues that warrant discussion. Id. See, also, *State v. Poindexter* (1988), 36 Ohio St.3d 1, 3, 520 N.E.2d 568.

{¶23} Accordingly, we summarily overrule LaMar's eighteenth proposition of law challenging the constitutionality of death-penalty proportionality review under R.C. 2929.05. See, e.g., *State v. Smith* (1997), 80 Ohio St.3d 89, 118, 684 N.E.2d 668; *State v. Steffen* (1987), 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph one of the syllabus. We also overrule LaMar's twentieth proposition of law, which challenges the constitutionality of Ohio's death-penalty statutory scheme on various grounds. We have considered all of these arguments and summarily reject them. See, e.g., *State v. Stallings* (2000), 89 Ohio St.3d 280, 297, 731 N.E.2d 159; *State v. Mills* (1992), 62 Ohio St.3d 357, 371-372, 582 N.E.2d 972; *State v. Seiber* (1990), 56 Ohio St.3d 4, 15-16, 564 N.E.2d 408. In neither proposition does LaMar offer any arguments that this court has not already rejected.

### III. Pretrial Issues

A. Failure to Disclose Exculpatory Evidence

**{¶24}** In his first proposition of law, LaMar asserts that the state failed to disclose material evidence tending to exculpate him in the murders, thereby denying him his constitutional right to a fair trial. See *Brady v. Maryland* (1963), 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215. Prior to trial, LaMar's counsel asked the state to produce all evidence of an exculpatory nature, as required by Crim.R. 16(B)(1)(f). The state's response did not provide a complete list of inmate statements, purportedly because of concerns about the safety of inmates who had given statements to law enforcement about the events of the SOCF riot. Instead, the state submitted to the trial court an eleven-page document containing summaries of inmate interviews.

**{¶25}** At a pretrial hearing, the trial court read summaries of inmate statements from the bench and, with a few exceptions, did not identify who made them. The contents of the summaries varied widely, ranging from useless information (e.g., "He was in a cell adjoining K-2-36 but gave no useful information") to pure speculation (e.g., "He was in an adjoining cell to K-2-36 and heard a commotion and thought Weaver hung himself") to statements with exculpatory value (e.g., "he observed Eskridge kill Svette in L-corridor"; "[h]e was in an adjoining cell * * * and identified Greg Curry telling Keith LaMar to kill Weaver because he was a snitch"). Many of the statements, however, corroborated LaMar's participation in the killings, while other statements named other assailants without eliminating LaMar as a participant.

**{¶26}** After reading all of the summaries, the trial court granted a continuance to the defense and authorized funds for a second defense investigator to conduct additional interviews of inmate witnesses. The trial court did not, however, require the prosecution to provide the full statements (i.e., contents of the statement with the name of the inmate who gave it) to the defense. Instead, the

court ordered the prosecution to provide the defense with the names of forty-three inmates who gave statements to law enforcement. Although the prosecution complied with the trial court's directive and provided a list of forty-three names, it did not match the statements with the names supplied.

**{¶27}** Suppression by the prosecution of evidence that is favorable to the accused and "material either to guilt or to punishment" is a violation of due process. *Brady*, 373 U.S. at 87, 83 S.Ct. 1194, 10 L.Ed.2d 215. Evidence suppressed by the prosecution is "material" within the meaning of *Brady* only if there exists a "reasonable probability" that the result of the trial would have been different had the evidence been disclosed to the defense. *Kyles v. Whitley* (1995), 514 U.S. 419, 433-434, 115 S.Ct. 1555, 131 L.Ed.2d 490; see, also, *United States v. Bagley* (1985), 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481. As the United States Supreme Court has stressed, "the adjective ['reasonable'] is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434, 115 S.Ct. 1555, 131 L.Ed.2d 490; see, also, *Strickler v. Greene* (1999), 527 U.S. 263, 289-290, 119 S.Ct. 1936, 144 L.Ed.2d 286.

**{¶28}** Assuming *arguendo* that the prosecution "suppressed" the evidence LaMar complains of within the meaning of *Brady*,[2] we find no due process violation. On the record before us, we find no reasonable probability of a different trial outcome had the defense received the full statements. Many of the statements

---

2. Because the defense knew *before* trial of the contents of inmate statements and the names of the inmates who gave them, there is arguably no *Brady* violation as a matter of law. At least two federal appellate courts have found *Brady* applicable only to the discovery *after* trial of information that was known to the prosecution and unknown to the defense. *United States v. Gonzales* (C.A.8, 1996), 90 F.3d 1363, 1368; *United States v. Soto-Alvarez* (C.A.1, 1992), 958 F.2d 473, 477. See, also, *United States v. Clark* (C.A.6, 1991), 928 F.2d 733, 738 (no *Brady* violation exists where a defendant knows of essential facts permitting him to take advantage of exculpatory information or where evidence is available from another source), citing *United States v. Grossman* (C.A. 2, 1988), 843 F.2d 78, 85, and *United States v. Davis* (C.A.11, 1986), 787 F.2d 1501, 1505.

10

identified LaMar as a participant in the murders. And statements identifying other inmates as participants did not exculpate LaMar because each victim had been attacked by multiple assailants. Cf. *State v. Waddy* (1992), 63 Ohio St.3d 424, 433, 588 N.E.2d 819 (holding evidence not to be material within the meaning of *Brady* when the evidence did not eliminate the defendant as the perpetrator). Finally, with respect to murders in cellblock L-6, none of the statements assisted LaMar's alibi defense (i.e., that LaMar was in the recreation yard at the time of the killings). In short, nothing in the contents of the statements "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435, 115 S.Ct. 1555, 131 L.Ed.2d 490.

{¶29} As a separate *Brady* claim, LaMar argues that the trial court should have found a *Brady* violation and granted his motion for a new trial after defense counsel discovered that the prosecution had provided complete inmate statements—the same material the defense had requested at the pretrial hearing in LaMar's case—in the criminal trials of two other SOCF inmates (Derek Cannon and Rasheem Matthews). LaMar argues that the disclosure in these two noncapital cases undercuts the prosecution's proffered reason (i.e., inmate safety) for failing to disclose the information in his case. As we stated above, however, the statements were not material to LaMar's case within the meaning of *Brady*. We therefore reject this argument.

{¶30} In his final *Brady* claim, LaMar claims that he should have received a new trial in light of evidence the defense discovered after trial. The evidence consisted of (1) Ohio State Highway Patrol summaries of two statements given by inmate Willie Kastner to investigators and (2) transcripts of interviews conducted by law enforcement officers with inmates David Hackett, Tyronne Golphin, Gerald Kelly, William Turner, and Daniel Davidson. These witnesses identified several persons other than LaMar as being involved in the murders of Vitale, Staiano, Depina, and Svette. LaMar further notes that the interviews with Hackett and

Davidson suggest that Vitale and Staiano may not have been dead at the time their assailants left L-6. Because the state failed to disclose these potentially exculpatory statements, LaMar argues that there has been a *Brady* violation warranting a new trial.

{¶31} We reject this *Brady* claim for reasons similar to the ones we stated above. While these statements identified other inmates, none of them exonerated LaMar. At best, these witnesses established that there were several persons who joined in beating the L-6 victims to death. The state's theory all along was that LaMar was one of many assailants who participated in murdering the victims in L-6. Therefore, the existence of this evidence does not undermine our confidence in the trial outcome.

{¶32} Finding no *Brady* violation that would warrant reversal, we reject LaMar's first proposition of law.

B. Allegations of a Biased Judge

{¶33} The trial court's treatment of the exculpatory evidence complained of in the first proposition of law also forms the basis of LaMar's second proposition of law. Because of the trial judge's actions, LaMar contends that he was deprived of his constitutional right to a fair trial before an impartial judge.

{¶34} It is well settled that a criminal trial before a biased judge is fundamentally unfair and denies a defendant due process of law. See *Rose v. Clark* (1986), 478 U.S. 570, 577, 106 S.Ct. 3101, 92 L.Ed.2d 460; *Tumey v. Ohio* (1927), 273 U.S. 510, 534, 47 S.Ct. 437, 71 L.Ed. 749. We have described judicial bias as "a hostile feeling or spirit of ill will or undue friendship or favoritism toward one of the litigants or his attorney, with the formation of a fixed anticipatory judgment on the part of the judge, as contradistinguished from an open state of mind which will be governed by the law and the facts." *State ex rel. Pratt v. Weygandt* (1956), 164 Ohio St. 463, 58 O.O. 315, 132 N.E.2d 191, paragraph four of the syllabus; see, also, *Cleveland Bar Assn. v. Cleary* (2001), 93 Ohio St.3d 191, 201, 754 N.E.2d

12

235. LaMar argues that the trial judge exhibited bias by "actually aid[ing] the prosecution in intermingling names, adding irrelevant inmate names and generally obfuscating the information that appellant was clearly entitled to." We do not agree.

{¶35} We first note that LaMar did not raise the issue of judicial bias in his appeal to the court of appeals. He has therefore forfeited this claim. *State v. Jalowiec* (2001), 91 Ohio St.3d 220, 224, 744 N.E.2d 163. Moreover, LaMar failed to avail himself of the procedures described in R.C. 2701.03, which allows a party to file an affidavit of bias and prejudice with this court seeking disqualification of a biased judge.

{¶36} Even if LaMar had raised this issue before the court of appeals, we would find no merit to his contention. LaMar relies on a general characterization of unfairness and bias by the trial court during the March 6, 1995 pretrial hearing to support his claim, without referring to any specific evidence of bias. But viewing the transcript as a whole, and taking all of the judge's comments in their proper context, we see nothing to suggest that the trial court harbored a hostile feeling of ill will toward either LaMar or his attorneys during the course of the trial. We accordingly reject the second proposition of law.

## C. Pretrial Discovery

{¶37} As a branch of his fourth proposition of law (alleging prosecutorial misconduct in various respects), LaMar argues that the prosecution improperly withheld discovery before trial.[3] Specifically, LaMar alleges that the prosecutor (1) ignored the trial court's order to provide transcripts of statements given by inmate witnesses, (2) repeatedly refused the trial court's orders to fully answer defense interrogatories in support of the defense's motion to dismiss on selective-prosecution grounds, and (3) failed to disclose summaries of inmate statements on

---

3. We consider LaMar's remaining arguments under the fourth proposition of law in Part VI, infra.

grounds of "confidentiality" and inmate safety, only to turn them over in other cases. We construe LaMar's argument, which asserts many of the same claims raised in the first proposition of law, as asserting violations of the discovery provisions contained in Crim.R. 16.

{¶38} Violations of Crim.R. 16 by the prosecution may result in reversible error only upon a showing that (1) the prosecution's failure to disclose was a willful violation of the rule, (2) foreknowledge of the information would have benefited the accused in preparing a defense, and (3) the accused has suffered prejudice. *State v. Joseph* (1995), 73 Ohio St.3d 450, 458, 653 N.E.2d 285. For the reasons we stated in overruling the first proposition of law, LaMar cannot establish prejudice because there was no reasonable probability of a different trial result even if the prosecution had disclosed the inmate statements LaMar complains of. And as for the prosecutor's alleged failure to answer defense interrogatories relevant to LaMar's selective-prosecution claim, LaMar's claim likewise fails. As we shall explain infra in disposing of the seventh proposition of law, LaMar did not make a prima facie showing of selective prosecution. Because he did not produce credible evidence of selective prosecution, he was not entitled to discovery on the issue. *United States v. Armstrong* (1996), 517 U.S. 456, 468-469, 116 S.Ct. 1480, 134 L.Ed.2d 687. We accordingly reject LaMar's pretrial-discovery argument.

D. Limitations on Jury Voir Dire

{¶39} LaMar's third proposition of law attacks the trial court's actions during jury selection. He argues that the trial court unreasonably and arbitrarily prevented him from "inquiring into proper subjects of *voir dire* including factors affecting credibility, the meaning of the presumption of innocence, defendant's right to remain silent, the burden of proof, and the juror's ability to follow instructions." LaMar cites numerous instances from voir dire when the trial court sustained prosecution objections to defense counsel's questions relating to areas such as (1) a potential juror's methods of evaluating a witness's credibility, (2)

whether the juror could convict just because LaMar presented no evidence, and (3) how a juror would feel if LaMar did not testify at trial. At one point, the trial court fined one of LaMar's attorneys $50 after the attorney, in apparent frustration, complained (in the presence of the jury venire) that he was "not getting a fair trial in this case" if he was not allowed to delve into certain areas with the potential jurors during voir dire.[4]

{¶40} Crim.R. 24 and R.C. 2945.27 afford both prosecution and defense counsel the opportunity to conduct reasonable voir dire of prospective jurors. Nevertheless, the length and scope of voir dire fall within a trial court's sound discretion and vary depending on the circumstances of a given case. *State v. Lundgren* (1995), 73 Ohio St.3d 474, 481, 653 N.E.2d 304. Accordingly, we will not find prejudicial error in how the trial court qualified venirepersons "as fair and impartial jurors" unless the appellant can show "a clear abuse of discretion." *State v. Cornwell* (1999), 86 Ohio St.3d 560, 565, 715 N.E.2d 1144; see, also, *State v. Beuke* (1988), 38 Ohio St.3d 29, 39, 526 N.E.2d 274. A trial court does not abuse its discretion unless it acts arbitrarily, unreasonably, or unconscionably. *State v. Adams* (1980), 62 Ohio St.2d 151, 16 O.O.3d 169, 404 N.E.2d 144.

{¶41} We find no abuse of discretion warranting reversal in this case. The voir dire limitations cited by LaMar paint an incomplete picture of how the trial court conducted the jury-selection process. At one point, when defense counsel expressed concerns that the trial court was limiting his ability to ask jurors "what their opinion will be if [LaMar] does not take the stand," the court agreed to allow him to inquire into this area with appropriate questions phrased in terms of the jurors' ability to follow instructions. The trial court also reconsidered its position on objections previously sustained and allowed the defense to "get back into that

---

4. The trial court later revoked this order, which it described as a contempt citation, and returned the $50 to LaMar's counsel.

area [of credibility]." As a result, the defense was allowed to ask numerous questions of prospective jurors about their methods of assessing credibility, how they would feel if LaMar exercised his right to refuse to testify, and their views on the concept of reasonable doubt. Thus, notwithstanding LaMar's arguments to the contrary, the record shows that defense counsel was allowed some latitude to explore these areas. Viewed in its entirety, we find no undue restriction in the manner the trial court conducted voir dire and therefore reject LaMar's third proposition of law.

## E. Selective Prosecution

{¶42} In the seventh proposition of law, LaMar contends that he is the victim of selective prosecution. LaMar, who is African-American, argues that the trial court should have dismissed the indictment against him on grounds that the state chose to prosecute him for capital offenses because of his race. Although the state prosecuted numerous inmates for murders committed during the SOCF riot, LaMar states that he was the only inmate charged with capital murder for killing other inmates.

{¶43} The decision whether to prosecute a criminal offense is generally left to the discretion of the prosecutor. *United States v. Armstrong*, 517 U.S. at 464, 116 S.Ct. 1480, 134 L.Ed.2d 687. That discretion is, however, subject to constitutional equal-protection principles, which prohibit prosecutors from selectively prosecuting individuals based on " 'an unjustifiable standard such as race, religion, or other arbitrary classification.' " Id., quoting *Oyler v. Boles* (1962), 368 U.S. 448, 456, 82 S.Ct. 501, 7 L.Ed.2d 446. Although a selective-prosecution claim is not a defense on the merits to the criminal charge itself, a defendant may raise it as an "independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution." *State v. Getsy* (1998), 84 Ohio St.3d 180, 203, 702 N.E.2d 866; see, also, *Armstrong*, 517 U.S. at 463, 116 S.Ct. 1480, 134 L.Ed.2d 687.

**{¶44}** To support a claim of selective prosecution, " 'a defendant bears the heavy burden of establishing, at least *prima facie*, (1) that, while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against him, he has been singled out for prosecution, and (2) that the government's discriminatory selection of him for prosecution has been invidious or in bad faith, i.e., based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights.' " *State v. Flynt* (1980), 63 Ohio St.2d 132, 134, 17 O.O.3d 81, 407 N.E.2d 15, quoting *United States v. Berrios* (C.A.2, 1974), 501 F.2d 1207, 1211. In this case, LaMar has failed to satisfy either prong.

**{¶45}** LaMar asserts that out of the more than twenty-five inmates who were indicted for homicide offenses relating to the SOCF riot, he was the only one charged with capital murder for "killing only inmates." LaMar also states that four other inmates, at least one of whom was white, were charged with noncapital offenses for participating in the same murders for which LaMar was convicted. Even accepting these assertions as true, LaMar fails to satisfy the first prong of the *Flynt* analysis because he has not shown that the state has treated him differently from other similarly situated individuals. The state built its case against LaMar on the theory that he organized and led a small group of inmates on a murderous rampage. The state presented considerable evidence that LaMar acted in a leadership role and participated in all five murders by either beating his victims or forcing other inmates to kill. Because of LaMar's extensive involvement, we cannot conclude that he was "similarly situated" with other inmates charged with noncapital offenses.

**{¶46}** LaMar also fails to satisfy the second *Flynt* prong. There is no evidence to suggest that the prosecution singled him out for death-penalty prosecution because of his race. Just two years ago, in fact, this court affirmed the convictions of a white inmate who received the death penalty for aggravated

murders committed during the SOCF riot. See *State v. Robb* (2000), 88 Ohio St.3d 59, 723 N.E.2d 1019. Although LaMar emphasizes that *Robb* involved a white inmate convicted of killing both an inmate *and* a corrections officer, we fail to see how this distinction matters for purposes of a selective-prosecution analysis. And even if it did, LaMar has done nothing more than make a bald assertion of differing treatment motivated by race. Absent some demonstration of an invidious motive, this court will not presume intentional or purposeful discrimination from a mere showing of different treatment. *State v. Freeman* (1985), 20 Ohio St.3d 55, 58, 20 OBR 355, 485 N.E.2d 1043.

{¶47} Under this proposition of law, LaMar also argues that the trial court erred when it denied his motion to dismiss the indictment on selective-prosecution grounds without stating its essential factual findings, as required by former Crim.R. 12(E) (now Crim.R. 12[F]). There was no such error in this case, however, because LaMar failed to request the findings he now claims were necessary. See *State v. Eley* (1996), 77 Ohio St.3d 174, 179, 672 N.E.2d 640. By failing to invoke the rule, LaMar has forfeited any error. Id. We reject LaMar's seventh proposition of law.

F. Prejudicial Joinder

{¶48} In his eighth proposition of law, LaMar argues that the trial court should have granted his pretrial motion to sever count nine of the indictment, alleging aggravated-murder and death-penalty specifications for Weaver's murder, from the remaining eight counts. LaMar claims that the Weaver count should have been tried separately from the other counts because the allegations relating to Weaver's murder "were quite different" from the allegations relating to the deaths of the other four victims. LaMar further contends that he was unduly prejudiced by the joinder of all nine counts because "trying these cases together gave the benefit to the state of permitting the jury to infer from the evidence presented in the deaths of the first four victims that Mr. LaMar was quite capable of directing the death of Dennis Weaver two days later."

18

**{¶49}** "The law favors joining multiple offenses in a single trial under Crim.R. 8(A) if the offenses charged 'are of the same or similar character.' " *State v. Lott* (1990), 51 Ohio St.3d 160, 163, 555 N.E.2d 293. Crim.R. 8(A) also allows joinder of two or more offenses that "are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct." Notwithstanding the policy in favor of joinder, an accused may move to sever counts of an indictment on the grounds that he or she is prejudiced by the joinder of multiple offenses. See Crim.R. 14. An appellate court will reverse a trial court's decision to deny severance only if the trial court has abused its discretion. *Lott*, 51 Ohio St.3d at 163, 555 N.E.2d 293.

**{¶50}** The state may rebut a defendant's claim of prejudicial joinder in two ways. The first way is by satisfying the "other acts" test. Id. If in separate trials the state could introduce evidence of the joined offenses as "other acts" under Evid.R. 404(B), a defendant cannot claim prejudice from the joinder. Id. See, also, *State v. Coley* (2001), 93 Ohio St.3d 253, 259-260, 754 N.E.2d 1129. The state may also negate a claim of prejudice by satisfying the less stringent "joinder test," which requires a showing "that evidence of each crime joined at trial is simple and direct." *Lott*, 51 Ohio St.3d at 163, 555 N.E.2d 293; see, also, *State v. Torres* (1981), 66 Ohio St.2d 340, 344, 20 O.O.3d 313, 421 N.E.2d 1288.

**{¶51}** The trial court did not abuse its discretion by denying severance in this case because the state satisfied both tests. Even if the state had tried the Weaver count separately from the others, the evidence of LaMar's participation in the L-6 murders would have been admissible under Evid.R. 404(B). The rule allows the admission of other-acts evidence for purposes other than proving that the accused acted in conformity with a particular character. In this case, count nine of the indictment contained an R.C. 2929.04(A)(5) specification alleging that LaMar had murdered Weaver as part of a "course of conduct" that involved the "purposeful

killing of or attempt to kill" two or more persons. Even if this count had been tried separately, the state would have had to present some evidence of the L-6 murders in order to prove this specification. Thus, there would have been a valid noncharacter purpose for admitting evidence of the other murders. Cf. *State v. Wilkinson* (1980), 64 Ohio St.2d 308, 317, 18 O.O.3d 482, 415 N.E.2d 261 (noting the admissibility of other-crimes evidence when " ' "they are so blended or connected with the one on trial as that proof of one * * * tends logically to prove any element of the crime charged," ' " quoting *United States v. Turner* [C.A.7, 1970], 423 F.2d 481, 483-484, and *United States v. Wall* [C.A.7, 1955], 225 F.2d 905, 907).

{¶52} Even if we were to hold that evidence of the L-6 murders would not have been admissible "other acts" in a separate trial for Weaver's murder, we are satisfied that the evidence for Weaver's murder was sufficiently "simple and direct" to negate LaMar's claims of prejudicial joinder. As LaMar's brief acknowledges, the Weaver murder occurred two days after the L-6 murders in a different cellblock and was accomplished by strangulation rather than bludgeoning. Accordingly, it is highly unlikely that the jury was confused as to which evidence tended to show that LaMar killed Weaver and which tended to show that he killed the L-6 victims. See, e.g., *Coley*, 93 Ohio St.3d at 260, 754 N.E.2d 1129.

{¶53} The eighth proposition of law is overruled.

### IV. Trial Phase Issues

A. Gruesome Photographs

{¶54} In the fifth proposition of law, LaMar contends that the trial court prejudiced his defense by allowing the prosecution to admit "gruesome and misleading photos" into evidence. In particular, LaMar challenges the admission of Svette's postmortem photographs. LaMar contends that Svette's photographs were particularly prejudicial in light of evidence that (1) Svette had multiple assailants apart from LaMar's group and (2) the photos did not depict how Svette

20

looked after the death squad left his cell. LaMar further argues that the prejudicial effect of all the admitted photographs was exacerbated by the prosecution's use of them during closing arguments.

{¶55} "Properly authenticated photographs, even if gruesome, are admissible in a capital prosecution if relevant and of probative value in assisting the trier of fact * * * as long as the danger of material prejudice to a defendant is outweighed by their probative value and the photographs are not repetitive or cumulative in number." *State v. Maurer* (1984), 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768, paragraph seven of the syllabus. We review a trial court's decision to admit photographs under an abuse-of-discretion standard. *State v. Morales* (1987), 32 Ohio St.3d 252, 258, 513 N.E.2d 267. We will not disturb a trial court's balancing of the probative value against the prejudicial effect unless the trial court has " 'clearly abused its discretion and the defendant has been materially prejudiced thereby.' " *State v. Slagle* (1992), 65 Ohio St.3d 597, 602, 605 N.E.2d 916, quoting *State v. Hymore* (1967), 9 Ohio St.2d 122, 128, 38 O.O.2d 298, 224 N.E.2d 126; see, also, *State v. Phillips* (1995), 74 Ohio St.3d 72, 78, 656 N.E.2d 643.

{¶56} We agree with LaMar that the two Svette photographs he challenges here—Exhibits 20H and 20K—were decidedly gruesome. Each depicted Svette's head split open at the crown, with Exhibit 20K showing a portion of Svette's bloodied brain. In addition, Exhibit 20H offered a frontal view of Svette's head, allowing jurors to see that Svette's face was also beaten badly. Notwithstanding the nature of the photographs, however, we cannot say that the trial court erred in admitting them. Both photographs supported the forensic pathologist's testimony that Svette had sustained four major blows to the head and that any of the four was sufficient to cause death. Even though there was testimony from an inmate witness that Svette's head "wasn't that far open" when LaMar had finished beating him, the court was well within its discretion to admit the photos and afford the jury an opportunity to see the effects of *all* of the blows to Svette's head, including any

inflicted by LaMar.  Inasmuch as LaMar inflicted at least one of the major blows that could have been sufficient to cause Svette's death, the photographs helped establish LaMar's intent to kill by graphically portraying the force with which Svette was beaten.  See *State v. Tibbetts* (2001), 92 Ohio St.3d 146, 156, 749 N.E.2d 226.

{¶57} LaMar also complains about the trial court's admission of mugshot-style photographs showing Svette, Staiano, Depina, Vitale, and Weaver while all were still alive.  We reject LaMar's arguments as to these photos.  Pre-death photographs are relevant and admissible for purposes of identifying the victims.  See *State v. Davie* (1997), 80 Ohio St.3d 311, 325, 686 N.E.2d 245; *State v. Roe* (1989), 41 Ohio St.3d 18, 22-23, 535 N.E.2d 1351.  LaMar's fifth proposition of law is overruled.

B.  Hearsay Testimony

{¶58} LaMar's sixth proposition of law attacks the trial court's admission of "highly prejudicial hearsay evidence."  Inmate Robert Bass, who witnessed the actions of LaMar's death squad at L-6 on the day of the SOCF riot, testified that he heard Allen tell LaMar, "Get your boys together and come on.  Come with me." The trial court overruled defense objections to this testimony.

{¶59} Out-of-court statements offered to prove the truth of the matter asserted within them are generally inadmissible as hearsay.  Evid.R. 801 and 802. If a statement is not offered for the truth of the matter asserted, however, it is not prohibited by the hearsay rule and will be admissible, subject to the standards governing relevancy and undue prejudice.  *State v. Maurer*, 15 Ohio St.3d at 262-263, 15 OBR 379, 473 N.E.2d 768.  Accordingly, "testimony which explains the actions of a witness to whom a statement was directed, such as to explain the witness' activities, is not hearsay."  Id. at 262, 15 OBR 379, 473 N.E.2d 768.

{¶60} In this case, the trial court properly overruled LaMar's objection because Allen's statement was not offered for its truth.  Rather, the prosecution

22

offered it to show that LaMar was the target of Allen's command. Allen's comment was therefore admissible as a nonhearsay statement showing that LaMar heard Allen's instruction and acted upon it.

{¶61} LaMar's counsel also objected to testimony by Bass about a statement made by Cannon. Bass testified that Cannon asked Bass whether he had seen LaMar before the group had embarked on its plan to kill snitches in L-6. The trial court properly overruled the hearsay objection because Cannon's question was not a "statement" within the meaning of the hearsay rule. Evid.R. 801(A) defines a "statement," for hearsay purposes, as "(1) an oral or written *assertion* or (2) nonverbal conduct of a person, if it is intended by him as an *assertion*." (Emphasis added.) "An 'assertion' for hearsay purposes 'simply means *to say that something is so*, *e.g.*, that an event happened or that a condition existed.' " (Emphasis *sic*.) *State v. Carter* (1995), 72 Ohio St.3d 545, 549, 651 N.E.2d 965, quoting 2 McCormick on Evidence (4th Ed.1992) 98, Section 246. Inasmuch as Cannon's question asserted nothing "because a true question or inquiry is by its nature incapable of being proved either true or false," it cannot be hearsay within the meaning of Evid.R. 801. Id.

{¶62} We accordingly overrule the sixth proposition of law.

### C. Sufficiency of Evidence

{¶63} In his ninth, tenth, and eleventh propositions of law, LaMar argues that the evidence was insufficient to support several of his convictions. He therefore argues that the trial court should have granted his Crim.R. 29 motions for acquittal with respect to Svette's murder, the course-of-conduct specification attached to Weaver's murder, and the kidnapping specification attached to the murders of Depina, Vitale, Staiano, and Svette.

{¶64} When reviewing the sufficiency of evidence to support a criminal conviction, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the

essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus; see, also, *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560. When conducting this review, we do not weigh the evidence; our inquiry is limited to whether reasonable minds could reach the conclusion reached by the trier of fact. See *Tibbetts*, 92 Ohio St.3d at 162, 749 N.E.2d 226. Issues concerning the weight given to the evidence and the credibility of witnesses are primarily for the trier of fact. *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus.

### 1. Aggravated Murder of Svette

{¶65} In connection with Svette's death, LaMar was convicted of aggravated murder under R.C. 2903.01(B), which at the time of the SOCF riot provided:

{¶66} "No person shall purposely cause the death of another while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit kidnapping * * *." 139 Ohio Laws, Part I, 1, 3.

{¶67} LaMar insists that the state did not present sufficient evidence showing that he caused Svette's death. He points to testimony showing that others beat Svette and that Svette remained alive after LaMar and his group allegedly left L-6 after their rampage. LaMar also emphasizes testimony attesting to the fact that Svette's postmortem photographs did not accurately depict how Svette looked after LaMar and his group beat him. Because of all these factors, LaMar contends that there is insufficient evidence to support a conclusion that he "caused the death of William Svette." At best, he contends, there was sufficient evidence only of attempted murder. We reject LaMar's argument.

{¶68} At least two witnesses testified that LaMar struck Svette's head multiple times with either a shovel or baseball bat. One of the witnesses added that LaMar even went back to Svette's cell to beat him a second time after noticing that

24

Svette was still alive. Furthermore, the forensic pathologist who testified for the state opined that Svette sustained four major blows to his head with a heavy object and that any *one* of those would have independently killed Svette. The jury was well within its province to infer that LaMar had struck one of those blows.

{¶69} The fact that others assaulted Svette and perhaps hastened his death does not undermine the sufficiency of the evidence to convict LaMar. Despite the actions of inmates Girdy and Frakes, who, according to witness testimony, finished Svette off, the evidence at trial supports an inference that LaMar's actions bore a causal connection to Svette's death. An offender who has inflicted injuries capable of causing death cannot escape culpability for homicide simply because intervening assailants have inflicted injuries that also contributed to the victim's death. See *State v. Keene* (1998), 81 Ohio St.3d 646, 655, 693 N.E.2d 246; see, also, *People v. Bailey* (1996), 451 Mich. 657, 676-678, 549 N.W.2d 325; *Holsemback v. State* (Ala.Crim.App.1983), 443 So.2d 1371, 1381-1382. Because sufficient evidence supports the conclusion that LaMar caused Svette's death, we overrule the ninth proposition of law.

### 2. Course-of-Conduct Specification for Weaver's Murder

{¶70} With respect to Weaver's murder, LaMar argues that the evidence is insufficient to support his conviction for one of the capital specifications. Specifically, LaMar argues that the state failed to present sufficient evidence that Weaver's murder "was part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons." R.C. 2929.04(A)(5). Even assuming that he participated in the four murders committed in L-6, LaMar urges that "there is no evidence that the Weaver killing was related" to them because Weaver's murder involved "a different scheme and a different mode of operation" and took place at a different time. We are not persuaded.

{¶71} The "course of conduct" specification applies to multiple murders that an offender commits as part of a continuing course of criminal conduct, even

if the offender does not necessarily commit them as part of the same transaction. See *State v. Benner* (1988), 40 Ohio St.3d 301, 304-305, 533 N.E.2d 701. In this case, a reasonable jury could have found that the circumstances surrounding the Weaver murder were intertwined with the four murders in L-6 that took place two days earlier. The state presented testimony that LaMar and his group murdered the L-6 victims *and* Weaver as part of a concerted effort to kill "snitches" at SOCF, indicating a common motive for all of the killings. And even though the Weaver murder happened at a different time than the other four murders, that fact does not preclude a finding of sufficient evidence to support a conviction for the course-of-conduct specification. Conduct taking place over several days may satisfy the R.C. 2929.04(A)(5) specification so long as the offender's actions were part of a continuing course of criminal conduct. See, e.g., *State v. Dunlap* (1995), 73 Ohio St.3d 308, 316, 652 N.E.2d 988 (two murders, ten days apart, committed in two states); *State v. Fautenberry* (1995), 72 Ohio St.3d 435, 444, 650 N.E.2d 878 (five murders committed in four states during a five-month period). The tenth proposition of law is overruled.

### 3. Kidnapping Specifications

{¶72} With respect to four of the victims—Depina, Vitale, Staiano, and Svette—the jury found LaMar guilty of the death-penalty specification alleging that he committed the murders while "committing, attempting to commit, or fleeing immediately after committing or attempting to commit kidnapping." R.C. 2929.04(A)(7). LaMar contends that there was insufficient evidence of kidnapping to support a conviction for this specification.

{¶73} The trial court instructed the jury on the definition of kidnapping set forth in R.C. 2905.01(A)(3), which states:

{¶74} "No person, by force, threat, or deception * * * shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:

26

**{¶75}** "* * *

**{¶76}** "(3) To terrorize, or to inflict serious physical harm on the victim or another."

**{¶77}** In *State v. Maurer*, 15 Ohio St.3d 239, 242-243, 15 OBR 379, 473 N.E.2d 768, this court considered a constitutional challenge to the validity of the R.C. 2929.04(A)(7) specification. The defendant argued that "in virtually every aggravated murder the victim will be restrained from liberty for the purpose of terrorizing or the infliction of serious physical harm" and that the specification therefore violated the constitutional requirement that aggravating circumstances adequately distinguish between offenses that are death-eligible and those that are not. See, generally, *Godfrey v. Georgia* (1980), 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398. This court rejected the argument by interpreting the R.C. 2929.04(A)(7) specification to require proof of something more than a restraint or movement incidental to the commission of a murder. That is, the court held that R.C. 2929.04(A)(7) requires "prolonged restraint, secretive confinement, or significant movement apart from that involved in the underlying crime in order to justify the application of the aggravating circumstance of kidnapping." *Maurer*, 15 Ohio St.3d at 243, 15 OBR 379, 473 N.E.2d 768; see, also, *State v. Jenkins* (1984), 15 Ohio St.3d 164, 197-198, 15 OBR 311, 473 N.E.2d 264; *State v. Logan* (1979), 60 Ohio St.2d 126, 135, 14 O.O.3d 373, 397 N.E.2d 1345.

**{¶78}** LaMar argues that there was not enough evidence of either prolonged restraint, secretive confinement, or significant movement to sustain a conviction on the kidnapping specification. For example, he argues, the evidence showed that Depina and Vitale were beaten inside their respective cells and in the range immediately in front of the cells. As to the Staiano murder, LaMar points to evidence that Staiano tripped and fell as he tried to escape his cell, after which Taylor attacked him. And with respect to the Svette murder, LaMar argues that there was no evidence suggesting that LaMar restrained Svette or removed him

from his cell. Accordingly, LaMar contends that any restraint or movement was merely incidental to the beatings, distinguishing this case from others in which we have upheld convictions for the R.C. 2929.04(A)(7) specification.

{¶79} If our focus were confined solely to the circumstances immediately preceding the murder of each victim, LaMar would have a substantial argument that any movement or restraint associated with any of them was incidental, at best, to the vicious assaults that caused their deaths. But beyond the evidence of movement incidental to the killings themselves, there was evidence that rioting inmates confined their victims in various cells and would not allow them to escape to the recreation yard with the nonrioting inmates. There was evidence that Allen, while each victim was locked in a cell, told LaMar and his group to "kill the snitches." Thus, a reasonable jury could find that the inmates in control of L-6 confined suspected snitches for the purpose of terrorizing or inflicting serious physical harm. Cf. *State v. Simko* (1994), 71 Ohio St.3d 483, 488-489, 644 N.E.2d 345 (finding sufficient evidence to support kidnapping specification when defendant restrained and terrorized victim for approximately a half-hour before murdering her as she tried to escape); *State v. Seiber*, 56 Ohio St.3d at 14-15, 564 N.E.2d 408 (kidnapping specification supported by evidence that, prior to shooting the victim, the defendant restrained bar patrons by ordering them on the floor and blocking exits). In turn, a reasonable jury could conclude that LaMar assumed control over the victims' confinement after Allen relayed the order for LaMar to "kill the snitches." Indeed, there was evidence that LaMar ordered Grinnell to open each victim's cell, supporting the inference that LaMar had some measure of control over the physical location and movement of the victims. Construing the evidence most strongly in the prosecution's favor, as we are required to do in a sufficiency-of-the-evidence inquiry, there was sufficient evidence that LaMar was at least an aider and abettor in the victims' confinement and thus capable of being "prosecuted and punished as if he were a principal offender" in the kidnappings.

28

R.C. 2923.03(F); see, also, *State v. Bies* (1996), 74 Ohio St.3d 320, 325, 658 N.E.2d 754. We therefore conclude that the trial court properly overruled LaMar's Crim.R. 29 motion for acquittal on the kidnapping specifications.

{¶80} The eleventh proposition of law is overruled.

### D. Surprise Testimony

{¶81} LaMar's thirteenth proposition of law asserts that the defense was unfairly prejudiced by "surprise" testimony on cross-examination by William "Geno" Washington, a defense witness. Washington was one of the ten inmates, including LaMar and Weaver, placed in the K-Block cell after corrections officers cleared the recreation yard on the morning after the riot began. On direct examination by defense counsel, Washington testified that Bowling and Childers had killed Weaver. He also testified that LaMar did not say anything about Weaver, did not order anyone to kill Weaver, and did not touch Weaver. On cross-examination, however, the state impeached Washington with the contents of an interview during which he told an investigator, among other things, that LaMar was one of the persons responsible for Weaver's murder. Washington repeatedly denied any memory of making the statement. LaMar argues that the defense was "completely surprised" by Washington's prior statement and that a new trial was therefore warranted.

{¶82} LaMar's counsel, citing Washington's testimony, filed a post-trial motion for new trial under Crim.R. 33(A)(3). This rule allows for a new trial on the grounds of "surprise which ordinary prudence could not have guarded against." To warrant a new trial, the surprise of which the defendant complains must have materially affected the defendant's substantial rights. A reviewing court will not disturb a trial court's decision granting or denying a Crim.R. 33 motion for new trial absent an abuse of discretion. See *State v. Schiebel* (1990), 55 Ohio St.3d 71, 76, 564 N.E.2d 54.

{¶83} LaMar has not met his burden of establishing an entitlement to a new trial under Crim.R. 33(A)(3). Although LaMar's counsel claimed surprise in his motion for new trial, he did not raise this issue during Washington's testimony. A trial court acts well within its discretion to deny a post-trial Crim.R. 33(A)(3) motion when defense counsel fails to raise the issue of surprise during trial. We accordingly reject the thirteenth proposition.

E. Newly Discovered Evidence

{¶84} In the twelfth proposition of law, LaMar claims that he was entitled to a new trial on the grounds of newly discovered evidence. Following trial, LaMar's attorneys moved for a new trial under Crim.R. 33(A)(6) after two inmates, James Were and Derek Cannon, had contacted them with information about LaMar's case. Were signed an affidavit stating that he was present in L-6 at the time of the murders and that LaMar did not participate in them. Were also stated that other inmates had been "displeased" with LaMar for refusing to participate in the riot and "considered him a traitor and coward."[5] Cannon provided LaMar's attorneys with two letters that inmate Anthony Walker had written to Rasheem Matthews, an alleged member of the group that attacked the L-6 victims. In one letter, Walker wrote that "LaMar's trail [sic] starts on Monday so try and stay up on it althrough [sic] you no [sic] he's hit anyway." In the second letter, Walker told Cannon, "I came from court and Sweat is hit." ("Sweat" was LaMar's nickname.) LaMar argues that the new evidence from Were and Cannon contradicted several of the state's witnesses, including Walker himself, and therefore raised a genuine issue concerning his guilt.

{¶85} The decision whether to grant a new trial on grounds of newly discovered evidence falls within the sound discretion of the trial court. *State v.*

---

5. Were was himself found guilty of capital murder for his actions during the SOCF riot. See *State v. Were* (Sept. 30, 1998), Hamilton App. No. C-950908, 1998 WL 682146, reversed (2002), 94 Ohio St.3d 173, 761 N.E.2d 591.

*Hawkins* (1993), 66 Ohio St.3d 339, 350, 612 N.E.2d 1227. To warrant the granting of a new trial, the new evidence must, at the very least, disclose " 'a strong probability that it will change the result if a new trial is granted,' " and must not be " 'merely cumulative to former evidence.' " Id., quoting *State v. Petro* (1947), 148 Ohio St. 505, 36 O.O. 165, 76 N.E.2d 370, syllabus. We find no abuse of discretion in this case because the newly discovered evidence forming the basis of LaMar's motion failed to satisfy these standards.

{¶86} Were's information was largely cumulative of other defense witnesses who likewise testified that LaMar was not present in L-6 at the time of the murders. And his affidavit testimony about other inmates thinking LaMar was a "traitor or coward" was speculative. As such, Were's testimony on this point was of questionable inadmissibility and therefore could not have provided a "strong probability" of an acquittal. Similarly, we see nothing in the Walker letters that would have disclosed a strong probability of a different trial result. Contrary to LaMar's arguments, the Walker comment about LaMar being "hit" did not suggest that there was perjured testimony at LaMar's trial. Walker's comment is reasonably—and perhaps better—construed as a statement of Walker's belief that the state had a strong case against LaMar. The trial court therefore did not abuse its discretion in finding the proffered newly discovered evidence insufficient to warrant a new trial.

{¶87} We also find unpersuasive LaMar's argument that the new evidence would have created "residual doubt" about his guilt, thus providing a mitigating factor that would have led the jury to choose a life sentence. Residual doubt is not an acceptable mitigating factor in determining the appropriate sentence in a capital case. *State v. McGuire* (1997), 80 Ohio St.3d 390, 403, 686 N.E.2d 1112. The twelfth proposition of law is overruled.

### V. Penalty-Phase Issues

#### A. Admission of Trial Phase Evidence

**{¶88}** In the fourteenth proposition of law, LaMar claims prejudicial error in the trial court's admission in the penalty phase of "all evidence submitted by the state in the guilt-innocence phase." In LaMar's view, some of the evidence was entirely irrelevant to the issue of whether the aggravating circumstances outweighed mitigating circumstances beyond a reasonable doubt. The defense specifically objected to the readmission of the trial exhibits, including all photographs of the victims, demonstrative evidence of the weapons used, and a walker that belonged to Svette.

**{¶89}** In *State v. Gumm* (1995), 73 Ohio St.3d 413, 653 N.E.2d 253, syllabus, this court recited the broad categories of evidence that the state may introduce during the penalty phase of a capital prosecution under R.C. 2929.03(D)(1) and (2). We held that, subject to applicable Evidence Rules, the state may introduce (1) any evidence raised at trial that is relevant to the aggravating circumstances specified in the indictment of which the defendant was found guilty, (2) any other testimony or evidence relevant to the nature and circumstances of those aggravating circumstances, (3) evidence rebutting the existence of any statutorily defined or other mitigating factors first asserted by the defendant, (4) the presentence investigation report, and (5) the mental examination report. Id.

**{¶90}** Under this standard, we find no error in the trial court's admission of the photographs and demonstrative exhibits depicting the weapons used. These items bore some relevance to the nature and circumstances surrounding the R.C. 2929.04(A)(5) course-of-conduct specification of which the jury found LaMar guilty. As for the admission of Svette's walker, we find merit in LaMar's contention that this item of evidence has only a tenuous connection, if that, to any of the aggravating circumstances for which LaMar was convicted. We do not, however, find that the admission of this item warrants reversal. The record of the sentencing hearing reveals no emphasis whatsoever on the walker or the fact that Svette used one. Thus, based on the record before us, we deem any error in

32

admitting this item of evidence to be harmless. And in any event, this court's independent reassessment can eliminate any possible error in the court's admission of this evidence. *State v. Williams* (1996), 74 Ohio St.3d 569, 578, 660 N.E.2d 724. We accordingly overrule LaMar's fourteenth proposition of law.

### B. Improper Penalty-Phase Argument

**{¶91}** LaMar's fifteenth proposition of law alleges that the prosecutor engaged in improper argument during the sentencing proceeding. LaMar argues that the prosecutor improperly argued that the jury should evaluate the mitigating factors in light of LaMar's culpability for the murders. For example, LaMar cites a portion of the closing argument in which the prosecutor rhetorically asked the jury, "[A]ll of the testimony that you have heard over the last two days, number one, is it mitigating? Does that lessen what he did? Does that explain what he did or justify what he did?" And even though the trial court sustained a defense objection to these remarks, LaMar notes that the prosecutor later continued along that same line of argument, telling the jury that "[n]othing was presented that mitigated what he did, and any mitigation is greatly outweighed and absolutely eclipsed by the aggravating circumstances." The trial court overruled LaMar's motion for mistrial following this comment.

**{¶92}** As LaMar correctly notes, "mitigating factors under R.C. 2929.04(B) are not related to a defendant's culpability but, rather, are those factors that are relevant to the issue of whether an offender convicted under R.C. 2903.01 should be sentenced to death." *State v. Holloway* (1988), 38 Ohio St.3d 239, 242, 527 N.E.2d 831. Thus, we have held that it is improper for prosecutors to make any comment to the jury during the penalty phase that the nature and circumstances of the murder are "aggravating circumstances." *State v. Wogenstahl* (1996), 75 Ohio St.3d 344, 662 N.E.2d 311, paragraph two of the syllabus. Nevertheless, LaMar overstates the significance of the prosecutor's comments in this case. For one thing, the trial court sustained a defense objection to the prosecutor's first foray into

questionable argument by instructing the jury to disregard the remark about whether the mitigating factors "justify" what LaMar did. We will ordinarily presume that the jury followed such an instruction by the court. See *State v. Loza* (1994), 71 Ohio St.3d 61, 75, 641 N.E.2d 1082. For another thing, the second remark by the prosecutor complained of by LaMar did not warrant a mistrial. The trial court ultimately gave correct penalty-phase instructions to the jury, including an instruction that the mitigating factors are "relevant to the issue of whether the Defendant should be sentenced to death." Thus, despite whatever complaints LaMar raises about the prosecutor's argument, the trial court cured any defect by essentially instructing that the mitigating factors are relevant to the question of whether LaMar should be sentenced to death and not simply to the question of whether LaMar's culpability is somehow reduced. We can therefore find no abuse of discretion in the trial court's decision to deny LaMar's motion for mistrial. See *State v. Garner* (1995), 74 Ohio St.3d 49, 59, 656 N.E.2d 623 (noting that the decision whether to grant a mistrial lies within trial court's sound discretion). And in any event, this court's independent sentence reassessment eliminates the effect of any error in the prosecutor's argument in this particular case. See *State v. Wilson* (1996), 74 Ohio St.3d 381, 398, 659 N.E.2d 292. The fifteenth proposition of law is overruled.

C. Penalty-Phase Jury Instructions

{¶93} In his sixteenth proposition, LaMar takes issue with the jury instructions used by the trial court at the sentencing phase. He asserts that the trial court's instructions prejudiced him by (1) failing to inform the jury that a "solitary juror could prevent the death sentence" and (2) placing undue emphasis on jury unanimity in returning a penalty verdict. LaMar's claims of error are without merit.

{¶94} In *State v. Brooks* (1996), 75 Ohio St.3d 148, 661 N.E.2d 1030, this court held that it is error for a trial court to require a jury to unanimously reject a death verdict before considering a sentence of life imprisonment. Id. at 160, 661

34

N.E.2d 1030. This court reasoned that "R.C. 2929.03(D)(2) contains no limiting language as to when a jury may contemplate a life sentence." Id. Thus, when the jury cannot unanimously agree on death as the appropriate punishment, it can properly consider alternative sentences. Accordingly, *Brooks* counseled courts in capital cases to instruct the jury that "a solitary juror may prevent a death penalty recommendation by finding that the aggravating circumstances in the case do not outweigh the mitigating factors." Id. at 162, 661 N.E.2d 1030.

{¶95} In this case, the trial court instructed the jury as follows:

{¶96} "You shall make a finding for the sentence of death if you unanimously, all 12, find by proof beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors as to each given death.

{¶97} "If you do not so find, you shall unanimously, and that's all 12, make a finding for either a life sentence with parole eligibility after serving 20 full years of imprisonment or a life sentence with parole eligibility after serving 30 full years of imprisonment.

{¶98} "Verdict forms with these three options will be furnished to you for each decedent. You will consider each death and the aggravating circumstances as to that death separately. The fact that you * * * unanimously agree on a sentence as to one death does not require you to impose the same sentence for any other death. You must unanimously decide the sentence for the death of each decedent applying the instructions I have just given you and uninfluenced by your verdict as to any other death.

{¶99} "* * *

{¶100} "With regard to the verdict that you render, all 12 of you, each and every one of you must sign in ink on the lines provided for your signature, the foreperson signing on the 12th line under which is printed the phrase foreperson.

{¶101} "Your verdict must be unanimous."

{¶102} We reject LaMar's contention that *Brooks* requires reversal in this case. The above instruction was virtually identical to the proposed penalty-phase instructions that LaMar's counsel submitted to the trial court. LaMar thus cannot complain of any alleged error in the instructions. Under the invited-error doctrine, a party cannot take advantage of an error that the party invited or induced the court to commit. *State v. Bey* (1999), 85 Ohio St.3d 487, 492-493, 709 N.E.2d 484.

{¶103} Even if the invited-error doctrine were not applicable, we would still reject LaMar's argument. LaMar's counsel did not object to the penalty-phase instructions and thereby forfeited all but plain error. See *State v. Lundgren*, 73 Ohio St.3d at 493, 653 N.E.2d 304. Although this court had not yet decided *Brooks* at the time of LaMar's trial, that fact did not obviate defense counsel's responsibility to object to instructions that were potentially erroneous. See *State v. Madrigal* (2000), 87 Ohio St.3d 378, 394, 721 N.E.2d 52 (collecting cases in which this court applied a plain-error analysis to alleged *Brooks* errors in cases tried before *Brooks* was decided). There was no plain error in this case.

{¶104} The instruction given by the trial court is vastly different from the one this court rejected in *Brooks*. The trial court never instructed the jury that it had to unanimously reject the death penalty before it could consider sentencing LaMar to life imprisonment. Accordingly, nothing in the instruction prevented the jury from considering a life sentence even if it had not unanimously rejected the death penalty. *Bey*, 85 Ohio St.3d at 498, 709 N.E.2d 484; see, also, *State v. Stallings*, 89 Ohio St.3d at 294, 731 N.E.2d 159 (upholding similar instruction against *Brooks* challenge); *State v. Smith* (2000), 87 Ohio St.3d 424, 438, 721 N.E.2d 93 (same). We reject the sixteenth proposition of law.

### D. Instructing Jury that Verdict was a Recommendation

{¶105} In the nineteenth proposition of law, LaMar argues that the trial court committed constitutional error by repeatedly informing the jury that its sentencing decision would be only a *recommendation*. Specifically, LaMar takes

issue with how the trial court explained the penalty phase to prospective jurors before voir dire:

**{¶106}** "[D]epending on your decision in the guilt or innocent [sic] proceeding, you might then be involved in a second proceeding. If this second proceeding takes place, the jury will have to make a recommendation of sentence for the aggravated murder charges. One of the recommendations could be the death penalty.

**{¶107}** "If you are selected and if you're required to make a recommendation of sentence and if that recommendation is death, then before that sentence may be ordered the Court must independently determine if the recommendation is supported with proof of evidence beyond a reasonable doubt."

**{¶108}** The trial court used similar language with other panels of prospective jurors. LaMar claims further prejudice from the fact that the jury verdict forms also used the term "recommend," thereby solidifying the concept that the jury was not ultimately responsible for a death verdict.

**{¶109}** The United States Supreme Court has held that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Caldwell v. Mississippi* (1985), 472 U.S. 320, 328-329, 105 S.Ct. 2633, 86 L.Ed.2d 231. Accordingly, the *Caldwell* court reversed a defendant's death sentence because the prosecutor's argument had left jurors with a mistaken impression that Mississippi's appellate courts—and not the jury itself—would be the ones actually responsible for imposing a death sentence. See id. at 331-333, 105 S.Ct. 2633, 86 L.Ed.2d 231. To establish a *Caldwell* violation, however, a defendant " 'necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law.' " *Buell v. Mitchell* (C.A.6, 2001), 274 F.3d 337, 353, quoting *Dugger v. Adams* (1989), 489 U.S. 401, 407, 109 S.Ct. 1211, 103 L.Ed.2d 435. LaMar cannot show that in this

case.  There is no *Caldwell* error in a case where, as here, a trial court's statements accurately reflect Ohio law and do not induce reliance on the appellate review process.  *State v. Durr* (1991), 58 Ohio St.3d 86, 93, 568 N.E.2d 674; see, also, *State v. Davie*, 80 Ohio St.3d at 326-327, 686 N.E.2d 245.

{¶110} Moreover, the penalty-phase instructions belie any claim that the jury misapprehended its role in the sentencing process.  The trial court specifically instructed the jury during the sentencing phase that it "should not     * * * impose a greater sentence than is deserved with the thought that the Judge will lessen the sentence, nor impose a lesser sentence than is deserved with the thought that the Judge will increase the penalty since the Court cannot increase the sentence."  This instruction sufficiently informed the jury of its "awesome responsibility" to evaluate the "appropriateness of death" without regard to what the court may or may not do when the jury has completed its evaluation. *Caldwell*, 472 U.S. at 330, 105 S.Ct. 2633, 86 L.Ed.2d 231.  Because the trial court correctly explained the capital sentencing process in this case, we reject LaMar's nineteenth proposition.

E.  Trial Court's Sentencing Opinion

{¶111} In his seventeenth proposition of law, LaMar claims that the trial court's sentencing opinion failed to comport with R.C. 2929.03(F), which requires a trial court imposing a sentence of death to "state in a separate opinion its specific findings as to the existence of any of the mitigating factors set forth in [R.C. 2929.04(B)], the existence of any other mitigating factors, the aggravating circumstances the offender was found guilty of committing, and the reasons why the aggravating circumstances the offender was found guilty of committing were sufficient to outweigh the mitigating factors."  In particular, LaMar contends that the trial court weighed several "nonstatutory aggravating circumstances" in reaching its decision to accept the jury's recommendation and impose the death penalty.

38

{¶112} The trial court's sentencing opinion accurately recited the aggravating specifications that LaMar was found guilty of committing in connection with each of the murders for which he was sentenced to death. LaMar takes umbrage, however, with the trial court's subsequent discussion of the circumstances of the murders under a heading entitled, "Aggravating Circumstances." In this section, the trial court mentioned the non-lethal assaults on inmates Andre Stockton and Ellis Walker, noting that "[t]he State elected to not charge the Defendant for these assaults, although the evidence was that he was a participant." The trial court continued with the facts of each murder and referred to the fact that both Depina and Vitale had begged and cried for mercy. And with regard to Svette's murder, the court wrote:

{¶113} "Once the death squad decided to leave L-6, they were confronted by an alleged Cleveland Mafia hit man, William Svette, serving his second life sentence for murder. * * * This time it was really and truly a life sentence, since Mr. Svette, age 69, and who walked with a walker, was killed. * * * Mr. Svette's head was so grossly injured that some pictures were kept from the jury's view. Suffice it to say that one could put his hand directly through the crack in Svette [sic] skull to his brain."

{¶114} The trial court later added that the rampage of LaMar and his group "is indicative of the Defendant's mental process, his power, control, cruel, violent and unremorseful attitude." According to LaMar, the trial court effectively treated all of these factors as "aggravating circumstances," meaning that the court impermissibly sentenced him to death based on aggravating circumstances not listed in R.C. 2929.04(A). LaMar further notes that there was no evidence presented at trial to support the trial court's recitation of facts about Svette's criminal record. Accordingly, LaMar contends that the trial court "improperly weighed findings on the aggravating side which were not permissible." We reject LaMar's contentions.

{¶115} It is permissible for the trial court to rely upon and cite the nature and circumstances of the offense as reasons to support its finding that the aggravating circumstances of which the jury found the defendant guilty outweigh the mitigating factors beyond a reasonable doubt. *State v. Fautenberry*, 72 Ohio St.3d at 440-441, 650 N.E.2d 878; *State v. Stumpf* (1987), 32 Ohio St.3d 95, 512 N.E.2d 598, paragraph one of the syllabus. It is sufficiently clear from the structure and organization of the sentencing opinion that this was the purpose of the trial court's recitation of the facts surrounding the murders. The trial court discussed the facts of each murder only *after* it had listed the statutory aggravating factors that the jury had found to exist. We are therefore convinced that the trial court knew the difference between statutory aggravating circumstances and the nature and circumstances of the offense. See *Fautenberry*, 72 Ohio St.3d at 441, 650 N.E.2d at 878. And to the extent the trial court relied upon nonrecord evidence about Svette's criminal record and the fact that Svette required a walker, we find nothing that would taint its findings that the aggravating circumstances outweighed the mitigating factors.

{¶116} Under this proposition of law, LaMar also argues that the trial court "improperly" analyzed the mitigating factors offered during the sentencing phase. In support of his argument, LaMar cites the following passage from the sentencing opinion:

{¶117} "It is true that the defendant was raised in a [sic] environment which suggested that he was destined to get into trouble. However, the same community allowed others to live and work within a community and society in a peaceful fashion when they chose to, compelling this court to conclude that the defendant functioned as a rational being during the period of time surrounding the criminal activity of which he has been convicted."

{¶118} Because the trial court openly refuted the notion that LaMar's background carried significant mitigating weight, LaMar contends that the trial

40

court did not properly weigh the mitigating evidence, thereby depriving him of an individualized determination of whether the death penalty was appropriate in this case. We reject this argument. Contrary to LaMar's contention, the passage suggests that the trial court analyzed whether LaMar's background affected his mental status in any appreciable manner at the time of the offenses committed, as the defense's mitigating evidence suggested.

{¶119} LaMar also argues that the trial court failed to consider testimony from Dr. Jeffrey Smalldon, indicating that LaMar suffered from a borderline personality disorder. LaMar contends that the trial court "wholly discounted" Dr. Smalldon's testimony as mitigating evidence. We disagree with LaMar's reading of the sentencing opinion on this point. The trial court specifically mentioned that LaMar "has been diagnosed over many years as having a borderline personality disorder which manifests itself in antisocial behavior." Thus, LaMar's argument is aimed more at the weight the trial court gave to the evidence. Matters involving the weight to be given to mitigating evidence are within the trial court's domain. *State v. Lott*, 51 Ohio St.3d at 171, 555 N.E.2d 293. "The fact that mitigation evidence is admissible 'does not automatically mean that it must be given any weight.' " *State v. Mitts* (1998), 81 Ohio St.3d 223, 235, 690 N.E.2d 522, quoting *State v. Steffen*, 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph two of the syllabus. Moreover, this court's independent sentence reassessment can correct any error in the trial court's treatment of the mitigating evidence. *Mitts.* See, also, *State v. Robb*, 88 Ohio St.3d at 83, 723 N.E.2d 1019; *State v. Fox* (1994), 69 Ohio St.3d 183, 191, 631 N.E.2d 124.

{¶120} Finally, LaMar claims that the trial court "wholly failed" to specify why the aggravating circumstances outweighed the mitigating factors beyond a reasonable doubt. This contention is simply incorrect. The trial court's sentencing opinion devoted almost three full pages to weighing the aggravating circumstances against the mitigating factors. The seventeenth proposition of law is overruled.

## VI. Prosecutorial Misconduct

{¶121} In the fourth proposition of law, LaMar claims that the prosecutor committed misconduct throughout his trial. To address these arguments, we must determine (1) whether the prosecutor's conduct was improper and (2) if so, whether it prejudicially affected LaMar's substantial rights. *State v. Smith* (1984), 14 Ohio St.3d 13, 14, 14 OBR 317, 470 N.E.2d 883. The touchstone of this analysis "is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips* (1982), 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78. We will not deem a trial unfair if, in the context of the entire trial, it appears clear beyond a reasonable doubt that the jury would have found the defendant guilty even without the improper comments. *State v. Treesh* (2001), 90 Ohio St.3d 460, 464, 739 N.E.2d 749; see, also, *Smith*, 14 Ohio St.3d at 15, 14 OBR 317, 470 N.E.2d 883.

### A. Improper Voir Dire

{¶122} LaMar claims that the prosecutor committed misconduct during jury voir dire. He first complains that the prosecutor ignored the trial court's request that the attorneys not "get into the facts" and "basically attempted to give an opening statement." LaMar cites one passage in which the prosecutor told potential jurors that "in this particular case Keith LaMar did hands-on killing of some of these people." The record shows, however, that the trial court sustained a defense objection to this statement and admonished the potential jurors not to treat such comments as evidence. Accordingly, LaMar has not shown any prejudice flowing from the prosecutor's remark.

{¶123} LaMar next claims that the prosecutor improperly vouched for the credibility of witnesses whom the state would call during trial. For example, the prosecutor discussed the credibility of inmate witnesses by telling the potential jurors that "most of the people involved at Lucasville, a lot of them are very, very decent people that have made mistakes in the past." Despite the trial court sustaining an objection to this remark, the prosecutor continued this line of

discussion by adding that "a majority of people in that particular situation did not want to be involved."

{¶124} "It is improper for an attorney to express his or her personal belief or opinion as to the credibility of a witness." *State v. Williams* (1997), 79 Ohio St.3d 1, 12, 679 N.E.2d 646. We do not, however, view the prosecutor's comments as improper vouching for the credibility of the inmate witnesses he would call at trial. Rather, the prosecutor was validly exploring the possibility that potential jurors would be predisposed to discredit certain witnesses simply because they were inmates. A prosecutor may properly try to "ensure that jurors would not be biased against his witnesses." *State v. Lundgren*, 73 Ohio St.3d at 484, 653 N.E.2d 304. And even if we believed that the prosecutor's comments were improper, they were harmless error at worst, particularly in view of the fact that the defense also relied upon inmate witness testimony.

B. Conduct During Opening Statement

{¶125} During his opening statement, the prosecutor read the indictment and recited the results from the autopsies performed on the murder victims. LaMar argues that this constituted an improper "attempt to focus the jurors on the horror of the crime rather than the evidence." We are not persuaded.

{¶126} As to the prosecutor reciting the autopsy results to the jury, LaMar's counsel did not object, thereby forfeiting all but plain error. See *State v. Clemons* (1998), 82 Ohio St.3d 438, 451, 696 N.E.2d 1009. Even if defense counsel had objected, however, the objection would have been overruled because there was no error. In view of the fact that the state admitted the autopsy results into evidence, the prosecutor's remarks about them were nothing more than a fair commentary on the facts to be presented at trial.

{¶127} As for the prosecutor's reading of the indictment during opening statement, the trial court properly overruled defense counsel's objection. LaMar cites no authority for the proposition that a prosecutor may not read from the

indictment during opening statement. Indeed, our precedent suggests that it is not improper to do so. In *State v. Graven* (1977), 52 Ohio St.2d 112, 6 O.O.3d 334, 369 N.E.2d 1205, for example, this court held that a trial court has discretion in a criminal case to let the jury take a copy of the indictment into the jury room. Id. at syllabus. If it is proper for the jury to read an indictment in the jury room, a defendant cannot claim prejudice from a prosecutor's reading the indictment during opening statement. Further, the trial court instructed the jury that neither the opening statement nor the indictment is considered to be evidence of an accused's guilt.

    C. Inappropriate Comments, Questions, and Arguing with the Court

   **{¶128}** LaMar also claims that the prosecutor acted improperly by questioning trial court rulings on defense objections, asking improper questions, arguing with witnesses, and making inappropriate comments. LaMar first cites the prosecutor's remarks during defense counsel's cross-examination of two prosecution witnesses. At one point, while the defense was attempting to impeach Robert Bass's testimony with the fact that Bass had reviewed the transcript of his prior statement before testifying, the prosecutor interrupted the questioning in an apparent attempt to explain the circumstances of Bass's receiving the transcript. Similarly, during the defense's cross-examination of Thomas Taylor, the prosecutor interjected, "I'll stipulate that I prepared my case and talked to every witness" when the defense was inquiring about Taylor's previous interviews with investigators and/or prosecutors. The trial court admonished the prosecutor not to make comments during the cross-examination.

   **{¶129}** Second, LaMar points to an instance of improper questioning during the prosecutor's cross-examination of Cory Perkins, a defense witness. LaMar complains of the following exchange, which occurred while the prosecutor was questioning Perkins about a statement Perkins had made to investigators about the Weaver murder.

44

{¶130} "Q. [by the prosecutor] What depth or details didn't you go in that you went into with the jury now?

{¶131} "A. Well, I mean, to be frank, I told them the same thing I told them. Just different things left out that ain't really no big thing.

{¶132} "Q. What did you leave out? We'll decide if it's a big thing or not.

{¶133} "MR. CARSON [defense counsel]: Objection, your Honor.

{¶134} "THE COURT: Sustained. It's argumentative."

{¶135} LaMar also complains of improper cross-examination when LaMar was on the witness stand. When the trial court instructed the prosecutor to limit his cross-examination about LaMar's boxing career to the fact of whether LaMar was in fact a boxer, the prosecutor ignored the admonition:

{¶136} "Q. [by the prosecutor] You are a heavyweight boxing champion in the institution, are you not?

{¶137} "MR. CARSON: Objection, your Honor. That's not the question you allowed.

{¶138} "THE COURT: Overruled.

{¶139} "A. [by LaMar] I'm a heavyweight boxer. I tried but I failed, and right before the riot took place—well, the riot stopped me from trying again. To answer your question, no, I'm not nor have I ever been a heavyweight champion within the institution.

{¶140} "Q. You are a boxer, are you not?

{¶141} "A. Yeah, that's correct.

{¶142} "Q. And as a boxer, you're trained to deliver a knockout blow?

{¶143} "MR. CARSON: Objection.

{¶144} "THE COURT: Overruled—or sustained. Excuse me.

{¶145} "Q: And as a boxer, you have a killer instinct, don't you Mr. LaMar?

{¶146} "MR. CARSON: Objection.

{¶147} "THE COURT: Sustained. Go to a different line of questions."

{¶148} LaMar also notes that the trial court "sustained a total of forty-five objections in the space of fifty-nine pages of transcript—several more than once" during his testimony. LaMar also complains that the prosecutor continually ignored the court's rulings by continuing improper lines of questioning with LaMar and other witnesses.

{¶149} Upon review of the record, we agree that the prosecutor engaged in some improper and unprofessional behavior. We find no reason for the prosecutor to have ignored admonitions by the trial court about improper questions. Similarly, we find it improper for the prosecutor to have interjected comments in open court, particularly when he interrupted testimony to make statements of fact and essentially testify in place of the witness. See *State v. Fears* (1999), 86 Ohio St.3d 329, 332, 715 N.E.2d 136 (reminding prosecutors to "be diligent in their efforts" to "refrain from the desire to make outlandish remarks, misstate evidence, or confuse legal concepts"). That being said, however, we disagree with LaMar about the prejudicial nature of the prosecutor's conduct; the misconduct cited by LaMar did not pervade the trial to such a degree that there was a denial of due process. See *State v. Keenan* (1993), 66 Ohio St.3d 402, 410, 613 N.E.2d 203. The trial court sustained numerous objections by defense counsel and, on the state of the record before us, we have no reason to believe that the outcome of the trial was affected by the prosecutor's improper comments. See *Fears*, 86 Ohio St.3d at 336, 715 N.E.2d 136.

### D. Improper Impeachment of the Defendant

{¶150} LaMar also claims misconduct in the manner in which the prosecutor asked questions about his prior conviction for murder. During trial and prior to LaMar's testimony, the defense had stipulated that LaMar had been convicted of murder in Cuyahoga County in 1989 and that, as a result, LaMar was incarcerated at SOCF at the time of the murders for which he was on trial. Nevertheless, during cross-examination of LaMar, the prosecutor delved into the

details of LaMar's prior murder conviction. The trial court sustained a defense objection after the prosecutor asked LaMar if he had shot his victim "with a gun" and "in the heart."

{¶151} When an accused testifies at trial, Evid.R. 609(A)(2) allows the state to impeach the accused's credibility with evidence that the accused has been convicted of an offense punishable by imprisonment in excess of one year. Under Evid.R. 609, the trial court has broad discretion to prohibit questioning about more than the "name, date and place of the conviction, and the punishment imposed, when the conviction is admissible solely to impeach credibility." *State v. Amburgey* (1987), 33 Ohio St.3d 115, 116, 515 N.E.2d 925. Acting within its discretion, the trial court sustained an objection to the prosecutor's line of questioning, which in any event consisted of only two questions about the circumstances surrounding LaMar's prior conviction. We find nothing unduly prejudicial about the prosecutor's conduct in this respect.

E. Improper Trial-Phase Closing Argument

{¶152} In his next claim of misconduct, LaMar alleges improper argument during the trial phase. Specifically, LaMar contends that the prosecutor denigrated defense counsel, used gruesome photographs in an unfair manner, and implored the jury to return a guilty verdict on a capital specification simply so they could proceed to the penalty phase.

{¶153} As to the denigration of the defense, LaMar calls our attention to the following passage of the prosecutor's closing argument:

{¶154} "Mr. Toy [defense counsel] told all of you on voir dire that this is the first case like this he's ever handled. He's never done this before. He got very excited, and he put on a show.

{¶155} "Let's look at the case carefully. First, let's look at some of the things that have been stressed to you by the Defense. Have you noticed that they always call the Defendant Keith? Has anybody noticed that?

**{¶156}** "[Defense objection overruled.]

**{¶157}** "Out of the hundreds or thousands of times that Keith LaMar has been referred to by the Defense, almost every time they refer to him as Keith, his first name. They have an angle to present to you in this case, and it's to call him— to humanize him, to call him by his first name."

**{¶158}** This is not the lone instance in which LaMar claims that the prosecution denigrated the defense. LaMar also calls our attention to another portion of the closing argument, in which the prosecutor compared his case to that of the defense. Even after the trial court sustained an objection to a comment in which the prosecutor accused the defense of having a strategy aimed at criticizing the prosecution and its witnesses, the prosecutor continued along this same theme:

**{¶159}** "First of all, let's talk about me. The Defendant told you on the witness stand that I put together a case against him, intimating to you that somehow I orchestrated all these witnesses like a puppet master or something and got them to come in here and testify against him. I agree I did prepare my case. I did put together a case; *but I put together a truthful case, an honest case*.

**{¶160}** "The Defendant and the defense attorney implied that I orchestrated perjury. This is totally inaccurate. It was implied that I know that these inmate witnesses came up here and lied and presented it in court anyway.

**{¶161}** "* * *

**{¶162}** "It was told to you that this was a fiasco and that Sergeant Hudson and Sergeant Brink, supervisors in the patrol, were sloppy and unprofessional with regard to this entire investigation. It was criticized by Mr. Toy the way the yard removal was handled. * * * It's very easy in hindsight to criticize the efforts of somebody else, a professional in that field.

**{¶163}** "* * *

**{¶164}** "But, again, Mr. Toy gets up here with his charts and his pencils and his pens and his pointer and tells you that Corrections Officer Clarkson, he just really dropped the ball.

**{¶165}** "These are good, honest men and women that are trying to do the right thing and because of him they have to get up here and get dragged through the mud in front of you, a court reporter, a judge, television cameras, and everything else. *I guess it's all part of the job*.

**{¶166}** "Why is this done? It's done to deflect attention away from Keith LaMar in the courtroom. * * * It's an attack on everything. *What does that tell you about their defense*?" (Emphasis added.)

**{¶167}** It is true, of course, that the prosecution is entitled to some latitude and freedom of expression in closing argument. *Keenan*, 66 Ohio St.3d at 409, 613 N.E.2d 203. "Realism compels us to recognize that criminal trials cannot be squeezed dry of all feeling." Id. That being said, however, some of the prosecutor's comments exceeded the scope of proper argument. In the first passage cited above, the prosecutor denigrated defense counsel by pointedly ridiculing the defense's apparent effort to remind the jury that LaMar was a human being. This tactic was just as improper as disparaging defense counsel for raising objections, which this court has condemned. See, e.g., id. at 406, 613 N.E.2d 203. As for the second passage complained of by LaMar, the prosecutor's juxtaposition of his "honest" case with the defense's case, particularly when viewed in light of the pointed criticism of one of LaMar's defense attorneys, unfairly suggested that the defense's case was untruthful and not honestly presented. In the context in which they were stated, the prosecution's comments imputed insincerity to defense counsel and were therefore improper. Id. at 405-406, 613 N.E.2d 203; *State v. Clemons*, 82 Ohio St.3d at 452, 696 N.E.2d 1009.

**{¶168}** The fact that the prosecutor engaged in some improper argument, however, does not warrant reversal unless the remarks prejudicially affected

substantial rights of the accused. *State v. Hessler* (2000), 90 Ohio St.3d 108, 125, 734 N.E.2d 1237. In making this determination, we must consider the effect of any misconduct in the context of the entire trial. *Keenan*, 66 Ohio St.3d at 410, 613 N.E.2d 203. We must also view the prosecutor's closing argument in its entirety when determining prejudice. *State v. Hill* (1996), 75 Ohio St.3d 195, 204, 661 N.E.2d 1068. Using these standards, we see no basis for reversing LaMar's conviction based on the prosecutor's comments. Even though some of the prosecutor's argument was improper, such comments did not pervade the entire trial, let alone the closing argument. We are unconvinced that the result of LaMar's trial would have been different without the few instances of improper commentary by the prosecution.

{¶169} LaMar also complains of the prosecutor's displaying and commenting on photographs of the victims during the closing argument. LaMar's counsel failed to object to this action by the prosecutor, thereby forfeiting all but plain error. See *Getsy*, 84 Ohio St.3d at 195, 702 N.E.2d at 866. There was no plain error here. Although a prosecutor may not use gruesome photographs during closing argument in an effort to appeal to the jurors' emotions, see *Keenan*, 66 Ohio St.3d at 407, 613 N.E.2d 203, we see no such effort here. The prosecutor focused his comments on what the photographs proved and did not make any emotional appeals to the jury to find LaMar guilty simply on the basis of what the photographs showed. We therefore disagree with LaMar's contention that the prosecutor committed misconduct in this respect.

{¶170} LaMar also contends that the prosecutor committed misconduct in the trial-phase closing argument when he remarked to the jury, "The Defendant is guilty of aggravated murder and specification. That's the way, the only way to get to the penalty phase." The trial court sustained a defense objection and instructed the jury to disregard this comment, which LaMar argues was an improper ploy by the prosecution to implore the jurors "to find the specification so they could get to

the sentencing phase." Even if we agreed with LaMar's characterization of the prosecutor's comment and motive for saying it, we would be unable to find reversible error. The trial court's curative instruction was sufficient to relieve any prejudice. *Loza*, 71 Ohio St.3d at 75, 641 N.E.2d 1082.

### F. Improper Penalty-Phase Closing Argument

{¶171} In addition to claiming misconduct in the prosecutor's trial-phase closing argument, LaMar also alleges that the prosecutor committed misconduct during the sentencing proceedings. He cites the following passages as instances of improper argument:

{¶172} • "But there are plenty of people who have lived successful lives, have made something of themselves when they were raised in poverty, when they were raised by a single parent."

{¶173} • "Keith LaMar made the conscious choices to kill a friend of his by shooting him twice in the heart."

{¶174} • "The prior purposeful killing, he has killed before; and [defense counsel] called that random violence. I think he used those words to you. There was no randomness in that. He took a gun and put it to the man's heart and he fired twice."

{¶175} • "As far as the mitigation, again, I might have heard things differently, but I heard that he was a very happy, well-adjusted child from the ages of birth to four or five years old."

{¶176} • "He was already given a chance at a life sentence and look what happened. There may be some mitigation in this case, but it certainly does not rise to nearly the level of the aggravating circumstances. Nothing was presented that mitigated what he did, and any mitigation is greatly outweighed and absolutely eclipsed by the aggravating circumstances."

**{¶177}** Because defense counsel did not object to any of these comments, our analysis is limited to ascertaining whether there was plain error. We find that none of the comments, either individually or in the aggregate, constitutes plain error.

**{¶178}** In the first comment complained of above, the prosecutor merely noted that not everyone with a troubled background similar to LaMar's has committed crimes of this magnitude. There is nothing wrong with this type of argument. *State v. Wilson*, 74 Ohio St.3d at 399, 659 N.E.2d 292. Such comment is fair rebuttal to the defense's argument that the jury should consider LaMar's background to be a significant mitigating factor in determining whether he should be sentenced to death.

**{¶179}** As for the second and third statements quoted above, we also see nothing improper. One of the aggravating circumstances in this case was the fact that LaMar had been previously convicted of murder. In its penalty-phase closing argument, the defense had told the jury to view the prior murder as an act of "random violence" that was typical of the environment in which LaMar was brought up. In light of the defense's comments, the prosecutor's comment about LaMar's prior offense constituted proper rebuttal.

**{¶180}** We also see nothing improper about the last two comments complained of by LaMar. The prosecutor's argument about LaMar's childhood rebutted defense contentions about LaMar's upbringing. Indeed, "the contention that the jury is to be carefully fed only that information which reflects positively upon the capital defendant [is] 'ludicrous.' " *Gumm*, 73 Ohio St.3d at 420, 653 N.E.2d 253, quoting *State v. Greer* (1988), 39 Ohio St.3d 236, 253, 530 N.E.2d 382. Similarly, we see nothing wrong with the last comment by the prosecutor. In it, the prosecutor merely argues his view on what the outcome of the case should be—that the jury should find that the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt. For these reasons, we find

52

LaMar's complaints about the prosecutor's penalty-phase argument to be without merit.

### G. Pattern of Misconduct

**{¶181}** Apart from all of the specific instances of misconduct, LaMar complains that the prosecutor engaged in a pattern of misconduct that "permeated" the proceedings and deprived him of a fair trial. LaMar urges that we cumulate the above-identified instances of misconduct and conclude that the entire trial was so tainted as to warrant reversal and remand for a new trial. We are not persuaded.

**{¶182}** Admittedly, we have recognized that there were some instances of questionable conduct by the prosecutor. But none of the instances of misconduct cited by LaMar, either individually or collectively, deprived him of a fair trial. The prosecutorial actions pinpointed by LaMar were relatively few and far between in the context of a trial that took over two weeks to complete. In numerous instances in this case, the trial court sustained defense objections and gave curative instructions when necessary. Cf. *Keenan*, 66 Ohio St.3d at 410, 613 N.E.2d 203 (noting that prosecutor's conduct can be exacerbated by lack of curative instructions and by trial court consistently overruling defense objections to misconduct). Although LaMar may not have received a perfect trial, we conclude that nothing in the prosecutors' conduct deprived him of a fair one. See *State v. Wilson*, 74 Ohio St.3d at 399, 659 N.E.2d 292.

**{¶183}** The fourth proposition of law is overruled.

### VII. Independent Sentence Review

**{¶184}** Having rejected each of LaMar's propositions of law, we now turn to our statutory duty to independently weigh the aggravating circumstances against the mitigating factors and, in addition, determine whether LaMar's sentence is disproportionate to sentences in similar cases. See R.C. 2929.05(A). Our review at this stage is limited to the four murders for which LaMar was given the death penalty. Id.

**{¶185}** The evidence in this case supports the existence of the aggravating circumstances found by the jury and the trial court. LaMar stipulated to the existence of two aggravating circumstances: (1) that LaMar was a prisoner in a detention facility at the time of the offense and (2) that LaMar had previously been convicted of murder. See R.C. 2929.04(A)(4) and (5). We further find that the evidence in the record proves that LaMar committed each aggravated murder as part of a course of conduct involving the purposeful killing of more than one person. R.C. 2929.04(A)(5). Finally, the evidence supports LaMar's conviction of the R.C. 2929.04(A)(7) specification attached to the aggravated murders of Vitale, Depina, and Svette. The state's evidence proved that LaMar was, at the very least, a complicitor in the Muslim inmates' kidnapping of the suspected snitches in L-6.

**{¶186}** In mitigation, several witnesses testified about LaMar's troubled background. LaMar, along with his siblings, grew up in a poor neighborhood where illegal drug activity and violence were common. LaMar's aunt, Carolyn LaMar, testified that LaMar lived with a stepfather who was "mean" to him and who would beat him for minor transgressions, such as failing to take out the garbage or touching his stepfather's things. And although LaMar's mother tried to look out for LaMar and his siblings, "she wasn't there for them because she was having her own problems." Carolyn also testified about shortcomings she perceived in LaMar's living conditions. For example, she testified that LaMar and his siblings were not well fed and lived in a house that was inadequately heated. Eventually, while still a teenager, LaMar quit school and moved out of the house to live with friends in an apartment, which was located in a neighborhood with lots of illegal drug activity.

**{¶187}** LaMar's older brother, Nelson LaMar, also testified for the defense and corroborated Carolyn LaMar's description of their upbringing. He testified that their stepfather was physically and mentally abusive and showed interest in the boys' lives only because of their athletic talent. According to Nelson, their

stepfather wanted them to be athletes and would beat them when they did not perform well athletically. Nelson also testified that he introduced his brother to drug dealing. Nelson told the jury that he "taught [LaMar] everything of the criminal element." At the time of his testimony, Nelson was himself in prison for a robbery conviction.

{¶188} Kim Granger, a former girlfriend who had known LaMar since the two were in high school, testified that LaMar did not have a good relationship with either his mother or his stepfather. She described LaMar as a "nice guy" who was heavily involved in sports before he started "getting into illegal activities like stealing and being in the streets a lot." LaMar told her that he did these things because he needed money for food and clothing. Granger, who remained friends with LaMar after he went to prison, also testified that LaMar had become "really spiritual" and described him as a "compassionate person."

{¶189} Charles R. See, a social service administrator with experience working with inner-city youth, also gave mitigation testimony for the defense. See interviewed LaMar and numerous members of LaMar's family to familiarize himself with LaMar's background. See described the area in which LaMar grew up as "socially and economically depressed," but noted that LaMar's athletic talent could have been his "ticket out of the ghetto" if he had received support and guidance. In See's view, however, LaMar's mother failed to provide strong parental support and LaMar's stepfather was excessively abusive. And when LaMar eventually moved to an apartment of his own, See noted that he began living in one of the "most dangerous areas in the city of Cleveland." Based on his background and living conditions, See testified that it was "ninety percent predictable" that LaMar would become involved in drugs and other illegal activities.

{¶190} Dr. Jeffrey L. Smalldon, a clinical psychologist, was the defense's final mitigation witness. He testified that LaMar was "unfailingly polite and

respectful" during their meetings and described LaMar as "an unusually thoughtful, reflective, introspective" person. Dr. Smalldon noted that LaMar denied involvement in the offenses for which he was convicted; this denial was unusual, Dr. Smalldon testified, in light of LaMar's usual disinclination to "shift blame onto other people * * * for various illegal things he's done over the years."

{¶191} As for LaMar's personal background, Dr. Smalldon opined that the absence of a stable male role model left a "profound void" in LaMar's life. Dr. Smalldon noted that LaMar never knew his biological father and that LaMar's stepfather, as well as an uncle, subjected him to "very, very harsh physical treatment." In turn, the abuse inflicted by LaMar's stepfather created a feeling of "helplessness" in LaMar, particularly because LaMar could not predict when the abuse would occur. In Dr. Smalldon's view, LaMar was also affected by his mother's "limited repertoire of parenting skills" and the death of another brother at a young age.

{¶192} Dr. Smalldon also testified to the effect that drugs and alcohol had on LaMar's life. LaMar used and sold marijuana when he was fourteen years old and eventually began abusing alcohol, cocaine, crack, and PCP. According to Dr. Smalldon, LaMar developed a serious crack cocaine habit that persisted until he went to prison in 1989. The drugs provided LaMar with a means of "escape" and served a "numbing function" that desensitized LaMar from the painful aspects of his day-to-day life. Dr. Smalldon ultimately diagnosed LaMar as drug- and alcohol-dependent. He also diagnosed LaMar as suffering from a "personality disorder not otherwise specified but one having antisocial and narcissistic features."

{¶193} In his unsworn statement, LaMar told the jurors that he was disappointed in their verdict but that he did not hold it against them. He also explained that his previous murder conviction resulted from a shootout in which he had also been shot. LaMar expressed some regret about that incident because the victim he shot "twice in the heart" had been a childhood friend. LaMar

56

acknowledged that his background had been difficult and added that he had instructed his mother not to testify for him because he "didn't want her to feel that she had to justify, you know, or apologize for doing the best that she could."

{¶194} In conducting our independent assessment of the appropriateness of the death sentence, we must weigh the aggravating circumstances against (1) the nature and circumstances of the crime, (2) the history, background, and character of the offender, and (3) any applicable mitigating factors enumerated in R.C. 2929.04(B)(1) through (B)(7). *State v. Treesh*, 90 Ohio St.3d at 491, 739 N.E.2d 749. Here, the nature and circumstances of the aggravated murders offer little to nothing in terms of mitigation. LaMar was the leader of a death squad that brutally beat the L-6 victims simply because they were suspected "snitches." And as to Weaver's murder, LaMar ordered others to strangle the victim and threatened cellmates with physical harm if they did not comply with his orders. Moreover, these circumstances convince us that the statutory mitigating factors enumerated at R.C. 2929.04(B)(1) (victim inducement), (B)(2) (duress, coercion, strong provocation), and (B)(6) (accused not being principal offender) are inapplicable in this case.

{¶195} As for the evidence relating to LaMar's background, we acknowledge that it is entitled to some weight. See, e.g., *Tibbetts*, 92 Ohio St.3d at 174, 749 N.E.2d 226. We accord it only modest weight, however, just as we have done in other capital cases of defendants with similarly troubled backgrounds. See, e.g., *State v. Spivey* (1998), 81 Ohio St.3d 405, 424, 692 N.E.2d 151. We also give some weight to Dr. Smalldon's diagnosis of LaMar's drug addiction. See *Treesh*, 90 Ohio St.3d at 493, 739 N.E.2d 749.

{¶196} The remaining statutory mitigating factors are generally inapplicable in this case. Although Dr. Smalldon testified that LaMar suffers from a personality disorder, we are unable to conclude that this condition rises to the level of a "mental disease or defect" that would trigger the R.C. 2929.04(B)(3)

mitigating factor in light of the absence of testimony that the condition prevented LaMar from appreciating the criminality of his conduct. See, e.g., *Tibbetts*, 92 Ohio St.3d at 173, 749 N.E.2d 226. LaMar's criminal record rendered R.C. 2929.04(B)(5) (lack of significant criminal history) inapplicable and we see no reason why LaMar's age at the time of the offenses should trigger the R.C. 2929.04(B)(4) "youth of the offender" factor. Finally, the evidence does not suggest the existence of any other mitigating factors. See R.C. 2929.04(B)(7).

{¶197} Against the modest mitigating evidence, we weigh the aggravating circumstances of which LaMar was found guilty. In this case, the aggravating circumstances are grievous: LaMar, already incarcerated as a convicted murderer, was the ringleader in a murder spree that killed five victims. We further note that the R.C. 2929.04(A)(5) prior-murder specification is of particular significance. As we just recently observed, "the (A)(5) prior-murder circumstance 'can be even more grave than other aggravating circumstances.' " *State v. Campbell* (2002), 95 Ohio St.3d 48, 58, 765 N.E.2d 334, quoting *State v. Taylor* (1997), 78 Ohio St.3d 15, 34, 676 N.E.2d 82. We therefore agree with the jury and the trial court that the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt.

{¶198} We also find that the death sentence in this case is appropriate and proportionate when compared with similar capital cases in which the death penalty has been imposed. See *State v. Steffen*, 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph one of the syllabus. We have affirmed the imposition of the death penalty in other cases involving murders committed during the SOCF riot. See *State v. Sanders* (2001), 92 Ohio St.3d 245, 750 N.E.2d 90; *State v. Robb*, 88 Ohio St.3d 59, 723 N.E.2d 1019. LaMar's sentence also appears appropriate and proportional when compared to other death-penalty cases involving similar aggravating circumstances. See, e.g., *State v. Campbell*, supra, 95 Ohio St.3d 48, 765 N.E.2d 334 (aggravated murder committed during a kidnapping by an offender

with a prior murder conviction); *State v. Carter* (1992), 64 Ohio St.3d 218, 594 N.E.2d 595 (aggravated murder committed in a detention facility by an offender with a prior murder conviction); *State v. Zuern* (1987), 32 Ohio St.3d 56, 512 N.E.2d 585 (aggravated murder in a detention facility); *State v. Hessler*, 90 Ohio St.3d 108, 734 N.E.2d 1237 (course of conduct involving multiple murders); *State v. Seiber*, 56 Ohio St.3d 4, 564 N.E.2d 408 (aggravated murder during a kidnapping).

{¶199} For the foregoing reasons, we affirm LaMar's convictions, including the sentences of death for the murders of Vitale, Depina, Svette, and Weaver.

Judgment affirmed.

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY and LUNDBERG STRATTON, JJ., concur.

PFEIFER, J., concurs in judgment.

———————————

**APPENDIX**

{¶200} Proposition of Law No. 1: The suppression by the prosecution of evidence favorable to an accused violates due process where the evidence is material to guilt or punishment. *Brady v. Maryland* (1963), 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215; *Kyles v. Whitley* (1995), 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490.

{¶201} When a trial court refuses to order the prosecution to provide witnesses' names and their corresponding exculpatory statements it denys [*sic*] appellant a meaningful opportunity to obtain the information thereby denying appellant due process as guaranteed by the federal and state Constitutions.

{¶202} The trial court erred in failing to grant defendant's motion for new trial under *Brady v. Maryland* following trial when it was discovered that the state

had provided the requested information in other cases although claiming it could not provide it in Mr. LaMar's case because they promised inmates confidentiality.

**{¶203}** The trial court erred in failing to grant defendant's motion for new trial under *Brady v. Maryland* following trial when it was discovered that the state had withheld exculpatory evidence that was not the subject of the information and statements discussed in (A).

**{¶204}** Proposition of Law No. 2: The Due Process Clause of both the federal and state Constitutions entitles an accused to trial before an impartial judge.

**{¶205}** Proposition of Law No. 3: When a trial court unreasonably and arbitrarily restricts a defendant's *voir dire* examination prejudicial error occurs in that the defendant is denied the right to a fair and impartial jury in violation of the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Sections 2, 9, 10 and 16 of the Ohio Constitution.

**{¶206}** Proposition of Law No. 4: A capital defendant is denied his rights to a fair trial, due process and a reliable determination of his guilt and sentence as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution when the prosecutor repeatedly engages in improper argument and other misconduct prior to and throughout the trial.

**{¶207}** Proposition of Law No. 5: Admission of gruesome and misleading photos when their prejudicial effect outweighs their probative value denys [*sic*] appellant a fair trial, due process and a reliable determination of his guilt and sentence as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution. This error was compounded by the trial court's admission of irrelevant photographs lacking any probative value used solely to inflame the jury.

**{¶208}** Proposition of Law No. 6: The admission of highly prejudicial hearsay evidence in violation of the Ohio Evidence Rules denys [*sic*] appellant his

60

federal and state constitutional rights to a fair trial and his right to cross-examine witnesses against him.

{¶209} Proposition of Law No. 7: The trial court erred in failing to grant appellant LaMar's motion to dismiss based on selective prosecution, thereby denying Mr. LaMar his constitutional rights under the Fifth and Fourteenth Amendments to the U.S. Constitution and Article I, Section 2, 10 and 16 of the Ohio Constitution. The trial court further erred in failing to require the state to properly comply with the defendant's discovery requests and to state its essential findings of fact regarding the denial of this motion on the record.

{¶210} Proposition of Law No. 8: In a case where the evidence is not simple and direct the refusal to sever charges where a jury is likely to confuse the offenses, cumulate the evidence and consider one offense as corroborative of other offenses, creates prejudicial error which denies a defendant his rights to a fair trial as guaranteed by both the Ohio and United States Constitutions.

{¶211} Proposition of Law No. 9: Appellant's convictions relating to the death of William Svette were based on insufficient evidence as a matter of law thereby denying the appellant due process of law. The trial court erred in failing to sustain appellant's motion for acquittal for the charges relating to William Svette, pursuant to Crim.R. 29, as the convictions of the appellant were based on insufficient evidence.

{¶212} Proposition of Law No. 10: Appellant's conviction of the specification alleging that the offense was a part of a course of conduct involving the purposeful killing or attempt to kill two or more persons pursuant to R.C. 2929.04(A)(5) as applied to the death of Dennis Weaver was based on insufficient evidence as a matter of law thereby denying the appellant due process of law. The trial court erred in failing to sustain appellant's motion for acquittal for the specification pursuant to Crim.R. 29, as the conviction of the appellant was based on insufficient evidence.

{¶213} Proposition of Law No. 11: Appellant's convictions for the aggravating circumstance alleging that the offense was committed while the offender was committing, attempting to commit, or fleeing immediately after committing or attempting to commit kidnapping and either the offender was the principal offender in the commission of the aggravated murder or, if not the principal offender committed the aggravated murder with prior calculation and design were based on insufficient evidence as a matter of law thereby denying the appellant due process of law. The trial court erred in failing to sustain appellant's motion for acquittal for the kidnapping specification on the charges relating to Darrell Depina, Bruce Vitale, Albert Staino [*sic*, Staiano] and William Svette, pursuant to Crim.R. 29, as the convictions of the appellant were based on insufficient evidence.

{¶214} Proposition of Law No. 12: The trial court committed prejudicial error in failing to grant Mr. LaMar's motion for a new trial based on newly discovered evidence thereby denying Mr. LaMar his constitutional rights to due process, a fair trial, effective assistance of counsel and a reliable sentencing determination as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution and Article I, Sections 2, 9, 10 and 16 of the Ohio Constitution.

{¶215} Proposition of Law No. 13: The trial court erred in failing to grant defendant's motion for new trial pursuant to Crim.R. 33(3) [*sic*, 33(A)(3)], thereby denying appellant LaMar his rights to due process, a fair trial, and effective assistance of counsel as guaranteed by the U.S. Constitution and the Ohio Constitution.

{¶216} Proposition of Law No. 14: The trial court committed prejudicial error in admitting all evidence submitted by the state in the guilt-innocence phase into the mitigation phase as much of the evidence was not relevant to any specific aggravating circumstance. Such error denied Keith LaMar his rights under the

Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution and his corresponding state constitutional rights.

{¶217} Proposition of Law No. 15: The trial court erred in failing to grant a mistrial, or in the alternative, to dismiss the jury when the prosecutor repeatedly argued inappropriately regarding mitigating factors which acted to deny Mr. LaMar the individualized sentencing determination required by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution and corresponding provisions of the Ohio Constitution.

{¶218} Proposition of Law No. 16: The trial court erred in instructing the jury during the sentencing phase by (A) failing to inform the jury a solitary juror could prevent the death sentence and (B) in placing undue influence on the requirement of unanimity such that Mr. LaMar's death sentences lack the reliability required by the Eighth and Fourteenth Amendments to the U.S. Constitution and Article I, Section[s] 2, 9, 10, and 16 of the Ohio Constitution.

{¶219} Proposition of Law No. 17: The trial court erred when it failed to comply with the dictates of R.C. 2929.03 by weighing non-statutory aggravating circumstances, by relying on evidence that was not a part of the record, by discounting the mitigating factors and by failing to articulate the reasons why the aggravating circumstances the offender was found guilty of committing were sufficient to outweigh the mitigating factors. This failure denied the appellant his due process rights as guaranteed by the United States and Ohio Constitution[s].

{¶220} Proposition of Law No. 18: The Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, Sections 10 and 16, Article I of the Ohio Constitution and R.C. 2929.05 guarantee a convicted capital defendant a fair and impartial review of his death sentence. The statutorily mandated proportionality process in Ohio does not comport with this constitutional requirement and thus is fatally flawed.

**{¶221}** This court, in performing its proportionality review, should compare Mr. LaMar's sentence with other inmate defendant's sentences received for crimes committed during the Lucasville riot. Such comparison would guarantee Mr. LaMar the rights set forth in the U.S. Constitution as well as those sought to be protected by the Ohio Constitution and Ohio capital statutory framework.

**{¶222}** In performing this comparison this court will find that from initiation of the charges through the trial and sentencing of Mr. LaMar, the prosecution selectively sought to impose a heavier penalty on appellant than any other inmate accused or convicted of killing inmates. Such selective prosecution cannot withstand scrutiny and accordingly this court will find that Keith LaMar's death sentences are in violation of both U.S. and state constitutional principles.

**{¶223}** Proposition of Law No. 19: Repeatedly instructing that a jury's verdict is only a recommendation violates the Fifth, Eighth and Fourteenth Amendments to the U.S. Constitution and Article I, Section[s] 2, 9, 10 and 16 of the Ohio Constitution. The prejudice an appellant suffers from this constitutional violation is further exacerbated by using the term "recommendation" on the actual verdict forms.

**{¶224}** Proposition of Law No. 20: The Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 2, 9, 10 and 16 of the Ohio Constitution establish the requirements for a valid death penalty scheme. R.C. 2903.01, 2929.02, 2929.021, 2903.022, 2929.023, 2929.03, 2929.04 and 2929.05, Ohio's statutory provisions governing the imposition of the death penalty, do not meet the prescribed constitutional requirements and are unconstitutional, both on their face and as applied.

––––––––––––––––––

Mark E. Piepmeier, Special Prosecuting Attorney, and William E. Breyer, Assistant Special Prosecuting Attorney, for appellee.

Carol A. Wright and Kristin Burkett, for appellant.

January Term, 2002

---