[Cite as *State v. Brunner*, 2022-Ohio-3013.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT


| | |
|---|---|
| STATE OF OHIO | JUDGES: |
| | Hon. William B. Hoffman, P.J. |
| Plaintiff-Appellee | Hon. John W. Wise, J. |
| | Hon. Patricia A. Delaney, J. |
| -vs- | |
| | Case No. 2021 CA 00158 |
| ERIC BRUNNER | |
| Defendant-Appellant | O P I N I O N |


CHARACTER OF PROCEEDING:      Criminal Appeal from the Court of Common Pleas, Case No. 1996 CR 00120


JUDGMENT:      Reversed and Remanded


DATE OF JUDGMENT ENTRY:      August 30, 2022


APPEARANCES:

For Plaintiff-Appellee

KYLE L. STONE
PROSECUTING ATTORNEY
TIMOTHY E. YAHNER
ASSISTANT PROSECUTOR
110 Central Plaza South, Suite 510
Canton, Ohio  44702-1413

For Defendant-Appellant

BRIAN C. HOWE
MARK GODSEY
OHIO INNOCENCE PROJECT
UC College of Law
P. O. Box 210040
Cincinnati, Ohio  45221-0040

*Wise, J.*

**{¶1}** Appellant Eric Brunner appeals from the December 3, 2021, decision of the Stark County Court of Common Pleas denying his motion for a new trial with respect to the attempted rape charge.

**{¶2}** Appellee is the state of Ohio.

<u>STATEMENT OF THE FACTS</u>

**{¶3}** For purposes of this Opinion, the relevant facts and procedural history are as follows:

**{¶4}** On February 7, 1996, the Stark County Grand Jury indicted Appellant Eric Brunner on one count of Rape, in violation of R.C. §2907.02, and one count of Attempted Rape, in violation of R.C. §2923.02. Appellant entered a plea of not guilty.

**{¶5}** The matter proceeded to a jury trial on May 20, 1996.

**{¶6}** At trial, the State presented six witnesses: the two victims, T.W. and D.D.; two investigating law enforcement officers; Tracy Addams, the nurse who collected the rape kit from T. W at the hospital; and Michele Mitchel from the Stark County Crime Lab, who testified concerning the rape kit.

**{¶7}** The following testimony was presented to the jury:

**{¶8}** On January 14, 1996, T.W. and D.D. went to the Chandelier Club. T. at 135-136. T.W. had one mixed drink, and D.D. did not have any alcohol. T. at 136-137, 199. They left the club around 3:00 a.m. the following morning and went to T.W.'s home where they had something to eat. T. at 137.

**{¶9}** That same evening, Appellant Eric Brunner was at a bar with his fiancée. T. at 138-139, 381-382. Brunner had been drinking, and the couple got into an argument. T.

at 138-139, 382. The fiancée drove home without Brunner. T. at 382. They left the bar around 2:30 a.m. *Id.*

{¶10} Brunner walked to the home of his first cousin, which was located between the bar and Brunner's home. T. at 138, 139, 384. He arrived not long after 3:00 a.m. and knocked on the door. T. at 138. Despite the late hour, T.W. let Brunner into the house because he was her cousin and she had known him all her life. T. at 129-130, 138. D.D. had also known Brunner for years. T. at 196-197.

{¶11} Brunner joined T.W. and D.D. in the living room. The lights were on all through the house as the three of them talked and watched television. T. at 139, 200-201. T.W. observed Brunner was drunk and slurring his words. T. at 138-139, 200-201. T.W. could smell the alcohol on him. T. at 139. T.W. got the comforter from her bed and fell asleep on the couch. T. at 140. D.D. also eventually fell asleep on the love seat a short while later. T. at 201-202, 214.

{¶12} D.D. testified that she awoke to Brunner rubbing her breasts. T. at 202. The lights and television were all turned off, but she stated that she could tell it was him because he was close, he was wearing the same clothes, and he was the only one there. T. at 202, 204, 217. She yelled "back up, Eric," which she said caused Brunner to stop and lay down on the floor. T. at. 202. She then went back to sleep. T. at. 202. She stated that when she awoke again, Brunner had his pants down, and was attempting to get on top of her. T. at 202-203. She testified that she elbowed Brunner off of her, and ran to T.W.'s bedroom and locked the door. T. at 202-203. She stated that Brunner followed her and attempted to open the door but that she yelled at Brunner again and he stopped. T. at 203.

{¶13} D.D. stated that she called her mother but did not try to wake T.W. because she felt that Brunner would not attempt to do anything to her because she was his first cousin. T. at 206. D.D. was reluctant to tell T.W. what Brunner had done because D.D. knew T.W. was close with Brunner, and D.D was afraid T.W. would not believe her. T. at 207, 229.

{¶14} T.W. testified that at approximately 4:30 to 5:00 AM, she awoke to Brunner on top of her with his pants down, restraining her arms and licking her face. T. at 142-144, 302. Although the lights were out, she knew it was Brunner because she could feel and see his long braids, smell his cologne, and he was face to face with her. T. at 142, 147, 150, 181. She observed that Brunner smelled awful and reeked of alcohol. T. at 142. She testified that Brunner had unbuckled her pants while she was asleep and that he held her down while he removed her pants. T. at 144-146. She stated that she tried to fight Brunner off throughout the encounter and that she yelled for help, but Brunner put his mouth over her mouth. T. at 145-148. She stated that she tried to push Brunner off of her and that she scratched at him to no avail, because Brunner was still wearing his shirt and T.W.'s press-on nails easily fell off. T. at 145, 149, 193-194. Once he succeeded in removing her pants, Brunner vaginally penetrated T.W. with his penis. T. at 146. According to T.W., the assault lasted only "a couple minutes." T. at 147. T.W. stated that, "[the assault] ended when I got him up off me, I got up and ran ... " T. at 147. T.W. also suffered an abrasion down her left side. T. at 208.

{¶15} T.W. then ran to her bedroom, but found the bedroom door locked. T. at 147. She banged on the door and yelled for D.D. to help. T. at 147. D.D. opened the door,

let T.W. in, and they locked the door until Brunner left the house. T. at 147. T.W. and D.D. went back to sleep without immediately discussing what had occurred. T. at 147-150.

{¶16} Brunner's fiancée testified that he arrived home around 6:30 AM. T. at 385. She estimated it should have taken him 45 minutes to walk home. T. at 384.

{¶17} Later that day, T.W. called D.D. and told her what happened to her the prior night. T. at 150-153, 207-208. At first T.W. told her that Brunner only attempted to rape her, but when they met again at T.W.'s home, D.D. saw T.W. was visibly upset and D.D. asked if Brunner actually raped her. T. at 207-209. T. W. responded that he did. *Id.*

{¶18} T.W. and D.D. called the police and reported the attack later that day. T. at 150-154. Detective Bruce Allison was assigned to investigate. T. at 268. T.W. went to Aultman to have a rape kit collected by nurse Tracy Addams around 3:00-4:00 PM. T. at 300. Two vaginal swabs were taken. T. at 326. T.W. told the nurse that she "believed" Brunner "probably" ejaculated. T. at 187, 302. However, T.W. maintained that it was a brief encounter and she was not certain. T. at 148. Further, T.W. disclosed to the nurse that T.W. had a consensual sexual encounter with her boyfriend approximately five days earlier. T. at 10-11, 405. T.W. 's prior consensual sex with her boyfriend was excluded by agreement of the parties just prior to trial. T. at 10-11, 405-409. Neither side attempted to exclude the rape kit or test results from evidence.

{¶19} Brunner consented to provide Det. Allison with DNA samples. T. at 272-273, 295. Brunner called Det. Allison wherein he admitted he was at T.W.'s house the morning they were attacked, but denied the accusations, telling the detective that he left the house fifteen minutes after he arrived. T. at 274.

**{¶20}** An analysis of a vaginal swab from the rape kit revealed a small quantity of seminal fluid and two dead sperm. T. at 332. Other items collected from T.W., including her clothes, nails, underwear, the couch cushion, and the comforter, did not test positive for semen with an acid phosphatase test. T. at 321-325. The protein sample from the rape kit was tested, but it was determined that the sample matched T.W. T. at 337-338. Brunner could not be excluded as the sample depositor based on the protein test. T at. 338.

**{¶21}** Due to the small amount of semen recovered, "DNA typing" was the only other test available at the time of Brunner's trial. However, the Stark County Crime Laboratory did not have the ability to do DNA typing. Trial Vol. II p. 358. While the FBI did have DNA type testing capability, it would not agree to test the sample because it had insufficient data to accurately compare two close relatives: T.W. and Brunner. Trial Vol. II p. 362-363. Consequently, no DNA typing was done at the time. The rape kit was never tested against T.W.'s boyfriend, with whom she had a consensual sexual encounter approximately 135 hours before the assault.

**{¶22}** The jury returned guilty verdicts on both counts: the rape count concerning T.W. and the attempted rape concerning D.D.

**{¶23}** On May 29, 1996, the trial court sentenced Appellant to an indeterminate term of 5 to 25 years on the rape conviction and a consecutive, indeterminate term of 4 to 15 years on the attempted rape conviction, for an aggregate indeterminate term of 9 to 40 years in prison.

**{¶24}** Appellant timely filed his direct appeal, and this Court affirmed his conviction in 1997. *See State v. Brunner* (May 27, 1997), Stark App. No.1996–CA–0181.

**{¶25}** On August 16, 2004, the trial court held a sexual predator classification hearing. Pursuant to the hearing, the trial court classified Brunner as a sexual predator, subject to registration under R.C. 2950.

**{¶26}** Appellant appealed, and this Court affirmed his sexual predator classification on March 28, 2005.

**{¶27}** On September 2, 2004, Appellant filed his first of four DNA testing applications. In his 2004 application Appellant asserted that any DNA collected from the rape kit necessarily belonged to the person who committed the rape for which he was convicted. The trial court granted the motion, over the State's opposition, in a decision issued January 21, 2005. The results, however, were of no help to Appellant because the 2005 testing did not detect the presence of any DNA other than the victim's own DNA.

**{¶28}** Appellant filed two additional applications for DNA testing, both of which were denied.

**{¶29}** Appellant was released from prison on parole in 2009, having served 13 years. He is still subject to mandatory reporting under R.C. 2950.

**{¶30}** On January 12, 2018, Appellant filed his most recent motion for DNA testing. The State again opposed the motion. The trial court granted the motion, and the Y-STR test was performed at the DNA Diagnostic Center.

**{¶31}** On November 5, 2019, the DNA Diagnostic Center authored a report (the "DDC Report"), opining that Appellant was not the source of the male DNA on the rape kit swabs.

**{¶32}** Appellant applied for leave to file a motion for a new trial on the basis of the DDC Report. The State responded in opposition.

{¶33} A hearing was held, and on December 3, 2021, the trial court granted Appellant's motion for a new trial as to the rape conviction, but denied his motion as to the attempted rape conviction. The court found that "the presence of sperm was never a part of the State's case regarding the attempted rape of D.D. Rather, [that conviction was based on] D.D.'s prior knowledge of and familiarity with Brunner, Brunner's admitted presence at the residence on January 14, 1996, and the assailant's response to D.D.'s request to 'back up, Eric.'" Trial Court Decision of December 3, 2021, p. 11.

{¶34}  Appellant now appeals, raising the following error for review:

<u>ASSIGNMENT OF ERROR</u>

{¶35} "I. THE TRIAL COURT ERRED BY DENYING APPELLANT'S MOTION FOR NEW TRIAL WITH RESPECT TO THE ATTEMPTED RAPE OF D.D."

**I.**

{¶36}  In his sole assignment of error, Appellant argues that the trial court erred in denying his motion for a new trial on the attempted rape conviction.  We agree.

{¶37}  Crim.R. 33 governs a motion for new trial:

**(A) Grounds.** A new trial may be granted on motion of the defendant for any of the following causes affecting materially the defendant's substantial rights:

***

(6) When new evidence material to the defense is discovered which the defendant could not with reasonable diligence have discovered and produced at the trial. When a motion for a new trial is made upon the ground of newly discovered evidence, the defendant must produce at the hearing

on the motion, in support thereof, the affidavits of the witnesses by whom such evidence is expected to be given, and if time is required by the defendant to procure such affidavits, the court may postpone the hearing of the motion for such length of time as is reasonable under all the circumstances of the case. The prosecuting attorney may produce affidavits or other evidence to impeach the affidavits of such witnesses.

{¶38} The decision whether to grant or deny a motion for a new trial is committed to the sound discretion of the trial court. *See State v. LaMar* (2002), 95 Ohio St.3d 181, 201, 767 N.E.2d 166; *State v. Williams* (1975), 43 Ohio St.2d 88, 330 N.E.2d 891, paragraph two of the syllabus; *see, also, State v. Matthews* (1998), 81 Ohio St.3d 375, 691 N.E.2d 1041; *State v. Schiebel* (1990), 55 Ohio St.3d 71, 564 N.E.2d 54, paragraph one of the syllabus. Thus, we will not reverse a trial court's denial of a motion for a new trial absent an abuse of that discretion. *LaMar,* 95 Ohio St.3d at 201, 767 N.E.2d 166; *Schiebel,* 55 Ohio St.3d at 76, 564 N.E.2d 54. An abuse of discretion is more than an error in judgment. Instead, it implies that a court's ruling is unreasonable, arbitrary, or unconscionable. *See, e.g., Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 450 N.E.2d 1140. "Moreover, a trial court generally abuses its discretion when it fails to engage in a ' "sound reasoning process." ' " *State v. Delawder*, 4th Dist. Scioto No. 18CA3854, 2019-Ohio-3379, ¶ 9, quoting *State v. Morris,* 132 Ohio St.3d 337, 2012-Ohio-2407, 972 N.E.2d 528, ¶ 14, quoting *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.,* 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990).

{¶39} "To warrant the granting of a motion for a new trial on the ground of newly discovered evidence, it must be shown that the new evidence (1) discloses a strong

probability that it will change the result of a new trial if granted; (2) has been discovered since the trial; (3) is such as could not in the exercise of due diligence have been discovered before the trial; (4) is material to the issues; (5) is not merely cumulative to former evidence; and (6) does not merely impeach or contradict the former evidence." *State v. Petro*, 148 Ohio St. 505, 76 N.E.2d 370 (1947), syllabus. *Accord*, *State v. Hawkins*, 66 Ohio St.3d 339, 350, 612 N.E.2d 1227 (1993), syllabus; *State v. LaMar,* 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶85.

**{¶40}** In the case *sub judice*, the trial court found that Appellant was entitled to a new trial on the rape charge based on the new DNA evidence. However, with regard to Appellant's motion for a new trial on the attempted rape charge, the trial court found:

When viewing the evidence relative to the attempted rape of D.D., the Court finds that the presence of the DNA in T.W.'s rape kit does not create a strong probability that Brunner would be found not guilty of the attempted rape of D.D. Specifically, the presence of sperm was never a part of the State's case regarding the attempted rape of D.D. Rather, the attempted rape of D.D. was based solely upon circumstantial evidence, including D.D.'s prior knowledge of and familiarity with Brunner, Brunner's admitted presence at the residence on January 14, 1996 and the assailant's response to D.D.'s request to "back up, Eric Brunner."

**{¶41}** Dec. 3, 2021, Judgment Entry at 11.

**{¶42}** Here, the state's theory of the case was that the same perpetrator, Appellant Eric Brunner, committed both the rape of T.W. and the attempted rape of D.D. because he was the only male in the house with the two women when they both fell asleep in the

same room, the assaults happened close in time to when the women fell asleep, and the assaults happened very close in time to one another.

**{¶43}** If a new jury would find, based on the new DNA evidence, that Appellant did not commit the charge of rape against T.W., the same jury could likely find that Appellant did not commit the crime of attempted rape against D.D.

**{¶44}** Upon review, we find that the impact of the new DNA evidence "discloses a strong probability that it will change the result if a new trial is granted" as to the attempted charge. *Petro*, 140 Ohio St. 505, 76 N.E.2d 370, at syllabus

**{¶45}** Appellant's sole assignment of error is sustained.

**{¶46}** For the reasons stated in the foregoing opinion, the decision of the Court of Common Pleas, Stark County, Ohio, is reversed and remanded for further proceedings consistent with the law and this opinion.

By: Wise, J.

Hoffman, P. J., and

Delaney, J., concur.

JWW/kw 0819